ALBERT M. WITTENBERG, HARRY CONTENT and WALTER CONTENT a co-partnership trading as H. Content and Company,

*vs.*

FEDERAL MINING AND SMELTING COMPANY, a corporation of the State of Delaware.

*New Castle, Apr. 19, 1926.*

148

*Robert H. Richards*, for complainants.

*Andrew C. Gray*, of the firm of Ward, Gray & Ward, and with him *Elihu Root, Jr.*, of New York City, for defendant.

THE CHANCELLOR. This case presents the question of whether the defendant may against the protest of preferred stockholders, the preferences of whose stock are such as the statement of facts shows, declare dividends on its common stock when, by reason principally of the depletion of ore bodies, the capital assets are impaired to the extent of about seven million dollars. In another form the question is, whether, there being a difficiency of net as-

sets below its paid in or invested capital, the directors may in the process of calculating the net profits of the defendant mining corporation for dividend purposes particularly on its common stock, calculate the same by subtracting from the gross amount received for its finished product, only the cost of mining, milling, marketing the same and overhead charges,. without charging off anything for the value of the ore taken out.

The question has been discussed from two points of view, viz., how stands the matter in the absence of statutory provisions, and, second, what is the answer where a statute is involved? The defendant contends that under the conception which the general law gives to the term "profits" when applied to a corporation of this type, the above method of calculating the same is permissible, and that when the same term appears in the Delaware statute the same import is to be given it that had theretofore been ascribed to it by the general law. In examining this argument, I shall first look into the general law upon the question without regard to our special statutory provisions, and then refer to the Delaware statute and its bearing on the subject.

The general rule is that corporations cannot declare dividends except out of profits. This rule requires that the invested capital shall be kept intact. 1 *Morawetz on Private Corporations*, (2d Ed.) § 435; 6 *Fletcher's Cyclopedia of Corporations*, §§ 3660, 3685; 5 *Thompson on Corporations*, (2d Ed.) § 5305; 2 *Machen on Modern Law of Corporations*, § 1313; 2 *Cook on Corporations*, (8th Ed.) § 546. As I read the briefs there is no dispute between the solicitors for the respective parties upon the proposition that this is the rule for corporations generally. But the defendant contends that if the corporation be a mining company or an oil company, or a concern that is exploiting a patent or a leasehold, profits may exist notwithstanding there be a depletion of the corporate capital. Companies of this kind are said to be wasting asset corporations. It is understood by everybody that such concerns live on themselves; they thrive by consuming their capital. Every ton of ore taken from a mining company's mine and every barrel of oil taken from an oil company's wells depletes the capital *pro tanto*. So does the mere passage of time deplete the assets of a company organized to exploit a patent or a leasehold. In this respect wasting asset cor-

porations are distinguishable from the ordinary mercantile or manufacturing concern. Stockholders are entitled to expect the latter, unlike the former, to employ their capital in the acquisition of profits and not to dissipate it in driblets in the form of dividends. There being this difference in the nature of the two types of corporations, it is argued that while profits cannot be said to have been earned in the case of the ordinary industrial enterprise so long as an unrecouped portion of the capital has been lost, yet in the case of the wasting asset corporation profits as the term is understood may exist even though the capital has been and is being depleted. If capital assets consisting of ore are taken out of the ground, their transmutation into the form of a pure metal does not destroy their character as capital. If it be conceded that the proceeds from their sale, less only the cost of mining, milling, marketing and overhead, may be regarded as available for dividends, the result nevertheless remains, that dividends are being paid in part at least from capital, there being no charge-off for the value of the removed ore. To describe earnings so derived as profits is totally unjustified in reason, so far I mean as the same are contributed to by the value of the ore taken out. If, therefore, the defendant can be permitted to regard the value of its ore taken out as available for dividends, it must be on the theory, not that its value had ceased to represent a capital asset and may properly be regarded as contributing to "profits," but on the theory that with mining companies the general rule which forbids the making of dividends out of capital is not applicable. The use of the word "profits" in connection with this aspect of the subject is a misnomer. A dividend, when made from proceeds constituted as were those in this case, is made in part at least from capital invested and not from profits.

Now, aside from all statutory provisions, is there any authority to the effect that proceeds derived in reality from capital assets, in the form of ore, may be regarded as available for dividends? If so, it is apparent that in the case of a mine the day is sure to arrive when the continued operation of the mine will have exhausted it, and the stockholders will find that all their capital has been paid out to them in installments in the form of dividends. If there is only one class of stock, so far as stockholders are con-

cerned no harm can be done by such a course of conduct, beyond the possibility that some of them may perhaps have not appreciated the fact that dividends so received really constitute a partial distribution of capital and so may have been deluded into losing their investment by spending all the dividends upon the theory that they represented earnings or profits as generally understood. Certain it is, however, that where this is done, each stockholder (there being but one class) will have ultimately received his *pro rata* share of the capital assets. Instead of receiving such share in a lump sum as upon liquidation, he will have received it by bits in the course of what might be called liquidation of capital by installments.

If, therefore, there is no statute to interfere, and creditors are not involved, it may with some reason be argued that a so-called wasting asset corporation ought to be permitted to write off nothing for its depleted capital assets when there are no preferences among stockholders, because unless this be so the only alternative would be for it to accumulate great cash reserves simply to abide the approach of a distant day for final distribution. Why not, reason suggests, permit the cash equivalent of consumed capital to be distributed to its ultimate owners *pari passu* with its accumulation, instead of compelling the mining or oil producing corporation to turn itself into what the solicitors for the defendant describe as a huge investment trust for the investment of accumulated cash reserves—an activity entirely unrelated to the sort of enterprise which the corporation and its officers are supposed to be especially equipped for?

In line with this reasoning the defendant cites the English case of *Lee v. Neuchatel Asphalt Co.*, (1889) 41 *Ch. Div.* 1, 58 *L. J. Chan. Div.* 408 (1889), as authority for the proposition that value of the ore in place and removed need not be charged off against receipts from which dividends may be declared. That case does so hold. It appears to be the leading authority on the subject. As I read that case, however, it has no persuasiveness as an authority in the instant one. This is for two principal reasons. First, the facts of that case show that the capital was not only not depleted, but on the contrary had increased. Here there is a large depletion. And second, though there were two classes of shares, viz., prefer-

ence and ordinary, yet with respect to capital all the shares were on the same footing. The preference shares were entitled to be preferred only in the matter of dividends, the article as to dividends being that the preference shares should first receive seven pounds per annum, then the ordinary shares should receive a like sum, and thereafter both classes should receive dividends without preference or distinction. In the instant case, however, a highly important distinction exists in the fact that the preferred shares are upon liquidation preferred over the common in the distribution of the capital. In the English case, if dividends had been made out of capital, the result would have been simply that each shareholder would have received, in bits to be sure, but nevertheless in its entirety, all that portion of the capital which each under the articles was entitled to. Now that is a very different case from this one. Here the preferred stockholders have a first claim not only on profits, but as well on the capital. The result will be that if the policy disclosed by the resolution which has already been acted upon and is proposed to be continued, is allowed to go on, the inevitable end will be that the mines will eventually become exhausted, the capital value represented by them will have become lost to the preferred stockholders who have a first claim thereon, and appropriated to the junior common stockholders in the shape of dividends. This thought is especially emphasized in the instant case because, unless new mines are found (a thing becoming increasingly difficult of realization), the present mines will, according to the facts before me, probably be exhausted within only six years from this date, and in the interval most of the remaining capital assets may be paid out in dividends to the common stockholders. The injustice of this result is the more glaring when it is remembered that the preferred stockholders have invested about twice as much money in the corporation's assets as have the common stockholders. The defendant frankly concedes that if its contention is sustained, all that a preferred stockholder, who has a senior charge on capital as well as dividends, is assured of from the corporation is a right to a series of dividends while the assets last and that the common stockholders may be paid all remaining proceeds from the sale of the transformed capital without any deduction of its value in the raw state. If this be true, such preferred stock of a

wasting asset corporation as we are concerned with in the instant case is grossly misnamed. The common stock is the real preferred, for in the end it may receive not only so much of the capital as equals its par, but all that there is in excess of its par, leaving possibly not so much as a crumb for its supposedly more favored companion. And this situation is aggravated in the case of a corporation where as in this one the preferred stockholders are denied either the right to vote at stockholders' meetings or to have notice of the same.

I do not find that the *Neuchatel Asphalt Case* lays down any doctrine that makes such a result possible. That case also was concerned with certain peculiar articles of association between the stockholders evidencing what the corporation might do in respect to so-called earnings. Before leaving that case it is not inappropriate to observe that, though it has since been approved in England, yet, notwithstanding it presents no such feature of a violation of the preferences obtaining between stockholders as this one does, the wide application of its language has met with some adverse comment from English judges and at least one eminent English text-writer. *Dorey v. Corey*, [1901] *A. C.* 447; *Bond v. Barrow Halmatite Co.*, [1902] 1 *Ch.* 353; *Sir Francis Beaufort Palmer, English Company Law*, (12th. Ed.) 227.

The *Neuchatel Asphalt Case* has been cited by courts and textwriters in this country as authority for the broad proposition that a wasting asset corporation may, for dividend purposes, consider as profits all its receipts less cost of producing, marketing and overhead without any charge or reserve for depletion of capital. It seems to me, however, to be contrary to the plainest principles of just and fair dealing among stockholders, with ranking capital preferences, to hold that the rule laid down in that case should apply to them. I cannot think that textwriters of such deserved repute as Cook, Fletcher, Machen and Morawetz, who are referred to as laying down the rule of the *Neuchatel Asphalt Case* as generally applicable and who cite that case among the authorities sustaining their text, can ever have meant to have approved of it except where it is sought to apply it to facts similar in principle to those found in the case where it was laid down. Until some acceptable authority is produced in which a wasting asset corpora-

tion is held to be justified in diverting the capital values of its assets into the pockets of common stockholders by way of dividends to the exclusion of preferred stockholders whose contract gives them, in relation to the common stockholders, a first and prior charge thereon, I shall assume that the broad language of judges and textwriters apparently justifying such a result was not meant to be so applied.

Is there any authority anywhere sustaining the applicability of the rule contended for by the defendant to a case of the instant kind? The textwriters referred to simply state the rule with a citation of cases. They do not discuss it in all its possible applications. It would seem desirable, therefore, to examine the cases upon which the general language of the textwriters is based for the purpose of ascertaining whether or not there is any judicial sanction for this rule in its application to a case where as here one class of stock is preferred as to capital assets over another.

I shall not make detailed reference to the English cases. What has already been said in connection with the *Neuchatel Asphalt Case* is sufficient with respect to them and need be supplemented only by the following brief observations—that no English case to which my attention has been called involves such an inter-relationship between stockholders as we have here; that the distinction which English courts draw between floating and fixed capital, a distinction which so far as I am aware is not recognized in this country, may play some part in the reasoning of the English judges; and finally the *English Companies Act* together with the articles of association evidencing the contract between the stockholders in a given case need to be carefully examined before cases decided under that act are accepted as pertinent authorities in American jurisdictions.

Let us then turn to the American cases with the view of ascertaining whether the wasting asset rule has been held in its wide application to apply to a case where dividends may be declared to common stockholders in the face of a capital preference in favor of objecting preferred stockholders and where a capital deficit is admitted.

The earliest case upon this subject appearing in the American courts is that of *Excelsior Water & Mining Co. v. Pierce*, 90 *Cal.*

131, 27 *P.* 44, decided in 1891. That case relying upon *Lee v. Neuchatel Asphalt Co.*, *supra*, holds that "profits" as used in the California Code, which prohibits the making of dividends "except from the surplus net profit arising from the business," and also prohibits the dividing of any part of the capital stock among the stockholders, may in the case of a wasting asset corporation be calculated without any allowance for the value of ore in place and removed. With respect to this case, some of the same distinguishing features are found as appear in the *Neuchatel Asphalt Case* which differentiate it from the instant one. These are, first, that all the stockholders were of one class, and second, that the capital seems not as a matter of fact to have been impaired.

The next case to arise in this country was that of *People v. Roberts*, 156 *N. Y.* 585, 51 *N. E.* 293, decided in 1898. That case cannot be regarded as an authority for the defendant here. The question there was whether for taxation purposes a certain investment had been made out of surplus or capital. The court referred to the rule laid down by the English case of *Lee v. Neuchatel Asphalt Co.*, *supra*, with apparent approval to be sure. But such reference was purely incidental, and was made simply to rebut the inference which the Attorney General drew in his argument that if a mining corporation paid dividends without setting aside a charge for removed ores, it must necessarily have accumulated no surplus. The case need not be commented upon further than to observe that the tax question involved in it and the manner of deciding it are of no help in determining what should be the answer in a controversy between classes of stockholders.

The case of *Booth v. Summit Coal Mining Co.*, 55 *Wash.* 267, 104 *P.* 207, 19 *Ann. Cas.* 1255, decided in 1909, is also cited by the defendant. But the controversy in that case was quite different from what we have in this case. There the sole question had to do with the meaning of the word "profits" as used in a contract between individual parties. Furthermore, all stockholders were of the same class, a circumstance which as before indicated should be allowed great weight as a feature distinguishing the case from the instant one, if, as was not the case, the question had been whether profits for common stock dividend purposes could exist in the face of a capital deficit, where another class of stock enjoyed a capital

priority over the common and the amount of depleted capital is proposed to be ignored in the process of calculating the profits.

The defendant relies with much confidence on the case of *Mellon v. Mississippi Wire Glass Co.*, 77 N. J. Eq. 498, 78 A. 710 (1910). I do not regard that case, however, as one which sustains the defendant's position. In the first place it does not appear that there was a capital deficit in the financial condition of the company there involved. Here there undoubtedly is. But, aside from that, the case was one where a preferred stockholder sought to compel the corporation tocreate and maintain a sinking fund for the benefit of the preferred stock before any dividends could be declared on the common stock. The Vice-Chancellor held, and correctly so I think, that the contract between the corporation and the preferred stockholders did not provide for such a fund and there was no power in the court to compel it and thus make a new contract between the parties. Here there is no attempt to compel the creation of a sinking fund. What is sought is simply to restrain dividends to common stockholders out of a portion of the capital until the capital is brought up to the paid in value. To be sure, this means the creation of a reserve fund if cash is held by the company. But cash need not be held. Other capital assets consisting of mines may be purchased by the cash if desired. At all events no sinking fund is sought to be forced upon the corporation. The Vice-Chancellor in the New Jersey case relied upon the *Neuchatel Asphalt Case* for his authority. But that case, as I have before observed, dealt with a corporation whose stockholders were of one class only, and does not therefore have any pertinency where stockholders exist having amongst themselves priorities with respect to capital. It seems to me that all that was necessary for the decision of the New Jersey case was to consider the terms of the contract which the Vice-Chancellor pointed out and that the *Neuchatel Asphalt Case* was not in point. Nor can I find anything in the case of *Goodnow v. American Writing Paper Co.*, 73 N. J. Eq. 692, 69 A. 1014, to which the Vice-Chancellor referred, in any wise approving the principle of the *Neuchatel Asphalt Case* as stated by him.

The defendant also cited in support of its position the case of *Van Vleet v. Evangeline Oil Co.*, 129 La. 406, 56 So. 343, decided in

1911. There was no ruling in that case upon the point here involved. What was said upon it was by way of discussion. But the most significant comment upon that case as distinguishing it from this one is that all the stockholders were of one class and the pertinent discussion in the opinion upon the point in which we are interested is to be read in light of that fact.

Another case cited by the defendant is *Stratton's Independence, Ltd., v. Howbert*, 207 *F.* 419, decided in 1912, by the District Court of the United States in the District of Colorado. This was a tax case and presented the question of whether the value of ore in place that was extracted from the plaintiff's mining property was allowable as "depreciation" in estimating the net income of the plaintiff subject to taxation under the Act of Congress (36 *Stat.* 112). The District Court discussed the meaning of the phrase "net income," and said that in the case of a wasting asset corporation "net income" does not contemplate an allowance for such extracted ore. The opinion referred to *People v. Roberts, supra*, and certain English cases, among which *Lee v. Neuchatel Asphalt Co., supra*, was cited; and apparently approved of the rule announced in those cases. But it is to be noted that this was a taxation case and stockholders' relative rights were in no wise involved. It is interesting to observe the manner in which this case was disposed of when it reached the Supreme Court of the United States. See 213 *U. S.* 399, 34 *S. Ct.* 136, 58 *L. Ed.* 285. By a divided court, the Chief Justice and two justices dissenting, it was held, as in the District Court, that the value of the extracted ore could not be deducted as "depreciation." The decision, however, turns on what was held to be an objectionable mode of calculating the extent of the claimed depreciation based on depletion of the ore supply, and expressly refused to state what the holding would be if the claimed depreciation had been based on depletion of the ore supply extracted in some other mode. The views of the District Court with respect to the reasoning based on the *Neuchatel Asphalt Case* and other cases cited by it were disregarded.

That the language of the federal cases which seems to bear on the subject in hand, but which appears in connection with the federal revenue statute referred to in them, is not pertinent in connection with such stockholders' controversies as we have in

the instant case, is apparent from the fact that the word "deprecia-tion," which constitutes the critical point on which the federal rulings turn, is said by the Supreme Court of the United States to have a generally understood meaning in business circles and that it does not include exhaustion of the ores in a mine. *Von Baum-bach v. Sargent Land Co.*, 242 *U. S.* 503, 37 *S. Ct.* 201, 61 *L. Ed.* 460. Any case, therefore, which hinges a tax decision on this some-what technical word, is an unsafe guide to the correct principle in the instant case, not only because of the fact that stockholders' relative rights are not involved, but as well because the decisional language is applied to construction of a statutory provision in no wise pertinent to the instant controversy.

The foregoing constitute all the cases to which the defendant has called attention as supporting its position. I find nothing in them which supports that position. It seems clear to me that on fundamental principles of right and justice, the complainants as preferred stockholders possessing a prior claim on capital assets have an equity which entitles them to protection against the pro-posed whittling away of those assets for the benefit of the less favored common stockholders.

To the suggestion that the contentions of the complainants, if sustained, might result in the creation of what the defendant, as before stated, describes as an investment trust for the investment of large reserves, two things are to be said. They are, first, that cash or securities need not be hoarded, if other mines are desired to be purchased, or if not and it is undesirable for any reason that the directors should invest the cash, preferred stock may be pur-chased on the open market or the capital stock may from time to time be reduced in accordance with the provisions of the act in that behalf.

There being no right under general principles for the corpora-tion to pay out dividends to the common stockholders under the present financial condition of the company, is there anything in our statute authorizing the proposed dividends? This is the next question to be answered.

Our pertinent statutory provisions are found in the *General Corporation Law.* They are as follows:

"*Sec.* 13. [After authorizing the issuance of preferred stock and the payment of preferred dividends thereon, the section proceeds in this language:] And when any such quarterly, half yearly or yearly preferred dividend shall have been paid or set aside as herein provided, a dividend upon the common stock may then be paid out of the remaining surplus or net profits of the company." 29 *Del. Laws, c.* 113 § 7.

"*Sec.* 34. DIVIDENDS; RESERVES:—The directors of every corporation created under this chapter shall have power, after reserving over and above its capital stock paid in, such sum, if any, as shall have been fixed by the stockholders, to declare a dividend among its stockholders of the whole of its accumulated profits, in excess of the amount so reserved, and pay the same to such stockholders on demand; provided, that the corporation may, in its certificate of incorporation, or in its by-laws, give the Directors power to fix the amount to be reserved." *Revised Code* 1915, § 1948.

"*Sec.* 35. \* \* \* No corporation created under the provisions of this chapter, nor the directors thereof, shall make dividends except from the surplus or net profits. \* \* \*" *Revised Code* 1915, § 1949.

The case of *Peters v. U. S. Mortgage Co.*, 13 *Del. Ch.* 11, 114 *A.* 598, was concerned with *Sections* 34 and 35 of the act, but is of no relevancy upon the point in controversy here. In that case, which it may be remarked was not a case of a wasting asset corporation, it was decided that for the purpose of ascertaining whether there was a surplus available for dividends, capital stock was to be listed at its paid in value rather than at its par value outstanding. The case was presented to the court with that question as the sole controversy in so far as the dividend dispute was concerned. What might be treated as profits or what might enter into surplus was neither decided by the court nor debated by the solicitors. Accordingly that case is laid aside as of no present assistance.

Now, what do our statutory provisions touching dividends mean? *Sections* 34 and 35 are the most important sections bearing on this question. Whatever meaning is given to the words "accumulated profits" in *Section* 34 and "surplus or net profits" in *Section* 35, will give color and complexion to the phrase "remaining surplus or net profits" as it appears in *Section* 13. I, therefore, address my attention to *Sections* 34 and 35 as controlling. In examining these sections their meaning with respect to corporations generally will be sought to be extracted without regard to whether the corporation is an ordinary industrial one or one known as a wasting asset corporation.

If *Section* 34 stood alone, I suppose there could be no doubt that if a corporation found its capital assets reduced below their paid in value, no matter what may have been the profits in the last current year out of which dividends could be made, no dividend could be declared without first bringing the capital up to its paid in value. But the defendant argues that *Section* 34 is simply a permissive section, it does not assume to lay down a rule of prohibition, and it is not permissible in view of *Section* 35 which follows with its inhibition, to infer that *Section* 34 on the principle of *expressio unius est exclusio alterius* is designed to say when dividends may not be declared. Therefore, says the defendant, we are to look to *Section* 35 to see if a proposed dividend falls under the ban of any of its prohibitions. If it does not, then that section being the only one of inhibition, there is no statutory rule anywhere forbidding the dividend. Furthermore, it is contended that though *Section* 35 is negative in its provision, yet it is also positive and affirmative by reason of the exception contained in it. In other words, it is as though it should read "corporations may make dividends out of surplus or net profits."

Now the word "or" being in the disjunctive, it is contended that the section points out two sources from which dividends may be declared, viz., surplus if any, or even though there is no surplus, yet from net profits in any current year in case such are earned. The force of this argument is particularly pointed out in this case, for it is contended that though the company's balance sheet shows a capital deficit, its profit and loss account for 1925 shows net profits in the sum of $3,440,000. To what extent the value of extracted ore which is not charged off against earnings contributes to this sum does not appear. But even if none were attributable to extracted ore, still a deficit exists.

*Section* 35 was taken from the New Jersey act (*P. L.* 1896, *p.* 277). Its counterpart in that act is *Section* 30. It is interesting to note that the New Jersey act has been amended since our act was adopted by making the language read "except from its surplus, or from its net profits." The introduction of that word "from" after the disjunctive conjunction has the evident effect of pointing out two funds from which dividends may be made. *Goodnow v. American Writing Paper Co.*, 73 *N. J. Eq.* 692, 69 *A.* 1014. Our

section, however, remains as orginally drawn. Evidently the New Jersey amendatory legislation was regarded as necessary to make it clear that two such funds were created. The Court of Errors and Appeals of New Jersey in the *Goodnow Case* took occasion to say that when this *Section* 30 was in the same condition as our *Section* 35 is in, there was room to contend that the words "net profits" were intended to be synonymous with the word "surplus." And even after the amendment was adopted, which clearly indicated two funds from which dividends might be made, the court refused to define "net profits" as profits made in any one year. Its language on this point was as follows:

> "Although the change in language indicates that the Legislature made a distinction between surplus and net profits, it does not necessarily follow that net profits mean the difference between gross earnings and what may be called operating expenses. Such profits may be called annual profits, and it may be that by net profits the Legislature meant the net profits upon the whole of the company's business from its organization. If either of these meanings is adopted, the declaration of the present dividend is justified."

And so here, when the advantage to the dividend lacks the aid of those words "or from," it may with more reason be said that by net profits is meant the net profits upon the business from its organization. Taking *Section* 35 in connection with *Section* 34 with which it of course must be construed, my conclusion is that the net profits are such as appear from the entire business of the company from its inception, and are not to be confined to one period and made synonymous with annual profits. This being the construction adopted, there are no net profits because the capital is heavily depleted.

Whether "net profits" is synonymous with surplus I shall not pause to discuss. It may be argued that it is not, and if not, then two funds exist from either of which dividends could be made and the paid in capital left undisturbed. In other words it may be argued that surplus can be created from a source other than profits, as for instance from sale of stock at a premium. In that event, though there are no net profits or accumulated profits from which to make a dividend, yet another fund, viz., the surplus, might be argued to exist to which resort may be had for a dividend. And so on this argument, the statute may be construed as referring to two

distinct dividend funds the existence of both of which is not inconsistent with the statutory conception that the paid in capital must always be maintained.

But whatever might be the correct view upon the question of whether "surplus" and "net profits" are synonymous, I am of the opinion that in this case there are no "net profits" within the meaning of the statute and certainly there is no "surplus."

In this view of our statute there is thus nothing therein which against the preferred stockholders authorizes the dividend already declared or permits similar common stock dividends in the future so long as the capital is impaired.

. Having said this, the bill and its prayers call for nothing more. It is not necessary to decide whether the general rule as to dividends laid down by the statute is applicable to wasting asset corporations. If it is not, then it is solely because they constitute an exceptional class. The statute does not except such corporations from its general rule. If, therefore, they are to be excepted it is only because the courts have discovered such peculiarities in their nature as to warrant the conclusion that as a matter of reason, common business practices and sound policy, it was never intended that the ordinary rule of the statute should apply to them. But where a great injury would be done to one class of stockholders and a correlative benefit conferred upon another class by allowing the exception, it would seem clear that to the extent at least of preventing the inequity of such a result courts which in the furtherance of justice have erected the exception ought in a like furtherance of justice refuse recognition to it.

Now whether the wasting asset doctrine should be accepted in this State as engrafted upon our statutory provisions concerning dividends, the present case as stated does not call upon me to determine, for, even accepting it, yet there is an equity in favor of the preferred stockholders which forbids the doctrine's application. But the declaration of a dividend on the preferred stock evoked some discussion concerning its propriety because if the doctrine referred to is not accepted here it is manifest that the preferred stockholders are not entitled to dividends so long as the capital deficit remains unrepaired. While the case does not call for an answer upon the point, yet it may not be inappropriate for

me to say that I incline to the view that the preferred dividend is permissible.

I am quite aware that this view may be criticised on the ground that the sections of the statute make no distinction between preferred and common stock dividends, and if there is no surplus or net profits for the latter there can consequently be none 'for the former. But this does not necessarily follow. Before the criticism can be sustained, it is necessary to reject those authorities hereinbefore reviewed which hold that with respect to wasting asset corporations, "profits" has a different meaning from that given to it in the ordinary case; or putting it in another way, that the rule confining dividends ·to profits as generally understood, whether that rule be founded on a statute or decisional law, has no application. Those authorities, as I have before pointed out, do not deal with situations where priorities between stockholders are involved upon which such an equity is justly based as I have attempted to show. Hence, when it comes to the preferred stock of this corporation which has no superior ranking above it, it may well be that the rule of the authorites referred to is sound and should be allowed free application. But of this no more need be said because the case does not call for a decision on the point.

Upon the question of whether a charge should be made against receipts in order to cover depreciation of plants, only brief comment need be made. That such a charge should be set up against earnings before profits available for dividends can be ascertained would seem true. *Whittaker v. National Bank*, 52 *N. J. Eq.* 400, 29 *A*. 203. While a charge for depreciation may not be necessary in the case of every corporation, yet in the case of a mining company whose plant is located at a remote mine and can be of little or no value after the mine is exhausted, it is apparent that a method of calculating profits which disregards the prospective scrapping of the plant is clearly unsound. To what extent, if any, a failure to allow for depreciation has contributed to the capital deficit in this case does not appear. But the want of a showing in this particular is of no present moment, for an admitted deficit exists, however it may have been occasioned. The course of the argument would seem to indicate that it has been due entirely or nearly so to a depletion of the ore values.

All that has hereinbefore been said should of course be understood as being confined solely to controversies *intra* the corporation. If creditors' rights are involved, an entirely different situation would be presented for consideration.

The demurrer will be overruled.

NOTE.—From an order overruling the demurrer an appeal was taken to the Supreme Court, the order of the Chancellor affirmed, and the cause remanded. See *post p.*411. Thereafter the cause was pleaded to issue and full hearing had. For opinion after full hearing see *post p.* 351.