HARRY WEINBERG, on behalf of himself and all other stockholders of Baltimore Brick Company similarly situated, Plaintiff Below,
Appellant,

JOSEPH MOSKOWITZ and SILVIA MARTIN, on behalf of themselves and all other stockholders of Baltimore Brick Company similarly situated, Intervening Plaintiffs Below,
Appellants,

vs.

BALTIMORE BRICK COMPANY, a corporation of the State of Delaware, LOUIS S. ZIMMERMAN, GEORGE C. WAREHIME, JR., JESSE SLINGLUFF, SR., JESSE SLINGLUFF, JR., WILLIAM O'MEARA, JOSEPH A. BROWN, HALL HAMMOND, C. GORDON PITTS, Defendants Below,
Appellees.

*Supreme Court of Delaware, June 10, 1955.*

*Arthur G. Logan* and *Aubrey B. Lank,* of Logan, Marvel, Boggs & Theisen, Wilmington (*T. Muncy Keith* and *Leighton S. Dorsey,* Wilmington, and *Raphael Walter* and *Lawrence I. Weisman,* Baltimore, Md., of counsel), for appellants.

*Henry M. Canby,* of Richards, Layton & Finger, Wilmington, and *William Marbury,* of Piper & Marbury, Baltimore, Md., for appellees.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: The question in this case is whether the charter of the Baltimore Brick Company contains a restriction preventing the company from declaring preferred dividends out of current net earnings while there is a capital deficit in respect of the common stock.

The company was incorporated in Delaware in September, 1902. It was organized to take over the assets and business of its predecessor, a New Jersey corporation of the same name. The company has outstanding 10,563 shares of first preferred stock and 8,344 shares of common stock. The rights of the first preferred stockholders under the Delaware charter are identical, we are advised, with their rights under the New Jersey charter. The dividend rights are as follows:

> "Said First Preferred stock shall entitle the holder to receive each year, out of the net earnings of the company, a fixed yearly dividend of five per centum (5%) before any dividend shall be paid upon or set apart for the said Second Preferred or said common stock, and the dividends on the said First Preferred stock shall be cumulative, no dividend being paid upon the Second Preferred or Common stock until the arrears of the dividends due on the First Preferred stock shall first have been paid."

The liquidation preference is as follows:

> "The holders of the said First Preferred stock in case of liquidation or dissolution of the company, shall be entitled to be paid in full, before any amount shall be paid to the holders of the Second Preferred or Common Stock."

The preferred shares have full voting rights. In addition, the preferred stockholders are entitled to elect six members of a board of nine directors.

A considerable amount of first preferred stock had been issued by the New Jersey corporation in connection with a refinancing of its funded debt. In 1902 an arrangement was effected with the bondholders whereby the latter surrendered the six per cent bonds and received in lieu thereof a smaller principal amount of five per cent bonds and a large number of shares of first preferred stock. In 1902 all of the assets were transferred to the Delaware company.

The company has a large arrearage of accumulated and unpaid preferred dividends. In recent years, beginning in 1950, the company has declared several dividends on its preferred stock. On June 30, 1954, a further dividend of $2.50 a share was declared, payable August 2, 1954. This action was objected to by the directors elected

by the common stockholders, including plaintiff, who is the owner of a majority of the outstanding common shares. Plaintiff thereafter brought suit in the court below to enjoin the payment of the dividend, alleging that the company had no "net earnings", that its common capital was impaired, and that the payment of the dividend would be in violation of law. The court declined to enjoin the payment of the dividend already declared, but temporarily restrained the declaration and payment of further dividends, and set the case down for hearing on a rule for preliminary injunction.

At the hearing the parties agreed that the company has net earnings for the current and preceding fiscal years available for the payment of dividends, and that the preferred capital is not impaired. They were and are in disagreement whether there is an impairment of the common capital. This latter issue the Vice Chancellor did not resolve, since he was of opinion that even if the common capital was impaired the dividend was nevertheless lawful, 108 *A.2d* 81. This holding plaintiff brings here for review.

The case turns upon the construction of the phrase "net earnings" in the charter provisions relating to the preferred stock. At the time when the Brick Company was incorporated the Delaware statute regulating the payment of dividends was the *General Corporation Law of 1901*. 22 *Del.L.Ch.* 394. Section 34 of that act provided as follows:

> "The Directors of every corporation created under this Act shall have power, after reserving over and above its capital stock paid in, such sum, if any, as shall have been fixed by the stockholders, to declare a dividend among its stockholders of the whole of its accumulated profits, in excess of the amount so reserved, and pay the same to such stockholders on demand; provided, that the corporation may, in its certificate of incorporation, or in its by-laws, give the Directors power to fix the amount to be reserved."

Section 35 provided in part as follows:

> "No corporation created under the provisions of this Act, nor the directors thereof, shall make dividends except from the surplus or net profits arising from its business. Dividends may

be paid in cash or capital stock at par, but otherwise the corporation shall not divide, withdraw, or in any way pay to the stockholders, or any of them, any part of its capital stock, or reduce its capital stock, except according to this Act, * * *."

In *Wittenberg v. Federal Mining & Smelting Corporation*, 1926, 15 *Del.Ch.* 147, 133 *A.* 48, 55, the Chancellor construed these statutes and held that in the light of the language of Section 34, the phrase "net profits" in Section 35 meant "such as appear from the entire business of the company from its inception". Since the corporate capital was depleted, there were no net profits, and no dividends could be declared. The decision was affirmed by the Supreme Court.

Shortly thereafter these sections were amended by the act of 1927, 35 *Del.L.Ch.* 85, and again amended in 1929, 36 *Del.L.Ch.* 135. These amendments are now codified in 8 *Del.C.* § 170, which reads as follows:

> "The directors of every corporation created under this chapter, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either (1) out of its net assets in excess of its capital as computed in accordance with the provisions of sections 154 and 242-244 of this title, or (2) in case there shall be no such excess, out of its net profits for the fiscal year then current and/or the preceding fiscal year."

Then follows a provision that no dividends may be paid if preferred capital is impaired.

It is conceded that if the statute governs the matter, the dividend is legal, since clause (2) specifically removes the prior statutory requirement of the existence of a surplus for the payment of dividends from current profits.

All the provisions of the *General Corporation Law* are impliedly written into every corporate charter granted under it. *Peters v. United States Mortgage Co.,* 13 *Del.Ch.* 11, 114 *A.* 598. But the expanded power over dividends contained in the 1927 and 1929 amendments is granted "subject to any restrictions contained"

in the charter. Hence the sole question presented is whether the language of paragraph Fourth of the Brick Company's charter relating to the First Preferred stock constitutes a "restriction", and if so, the nature and extent thereof. The language relied upon by plaintiff is—

"Said First Preferred stock shall entitle the holder to receive each year, *out of the net earnings of the company,* a fixed yearly dividend of five per centum" etc. [Emphasis supplied.]

Plaintiff's argument that the quoted language embodies a restriction upon the payment of preferred dividends runs as follows:

The designation of "net earnings" as the source from which the dividend may be paid necessarily means that such earnings constitute the exclusive source for payment. Moreover the phrase "net earnings", like "net profits", means earnings accumulated over the entire life of the corporation, *i. e.,* earned surplus. This is so, because by judicial construction both the New Jersey and Delaware statutes, at the times when the charters were filed, forbade the payment of dividends if the corporate capital was impaired. The provisions of Section 35 of the Delaware act of 1902 were copied from the comparable section of the New Jersey act of 1896 [N.J.S.A. 14:8—19], see *Wittenberg v. Federal Mining & Smelting Co., supra,* and the preferred stock provisions of the company's Delaware charter were copied from the New Jersey charter, and took with them the construction placed upon the phrase "net earnings" by the New Jersey decisions. Hence, plaintiff concludes, the language of the charter restricts the source of payment of preferred dividends to earned surplus. Plaintiff makes the subsidiary point that the word "earnings" is narrower in scope than the word "profits"; and its use impliedly forbids payment of the dividend not only from paid-in or capital surplus, but also from "windfall profits".

This argument requires analysis. What plaintiff is asserting is that the language of the charter—"out of the net earnings"—is doubly restrictive in meaning. His contention comes to this: that the phrase is expressly restrictive because it designates an exclusive source of the dividend—earnings as opposed to a balance sheet surplus; and

impliedly restrictive because the phrase is used in the narrow sense of earned surplus.

Defendant replies that the phrase "net earnings" is nothing more than a paraphrase of the statutory language and is not a "restriction" within the meaning of Section 34; and that the use of the phrase in the charter was not intended as a restriction of any kind and should not be construed as such.

Let us consider first the question whether the phrase "net earnings" restricts the source of payment, or whether the language is a mere paraphrase of the statute. The point is one of some importance in Delaware law, because of the 1927 amendment. It has been held by the District Court of Delaware, by way of dictum, in *Barrett v. Denver Tramway Corporation,* 53 *F.Supp.* 198, 200, that a mere incorporation in the charter of the statutory phrase—"surplus, or net profits"—is not a restriction within the meaning of § 170. We are in accord with Judge Leahy's views in that case. A mere incorporation of the statutory language is equivalent to a statement that dividends may be declared as provided by law. But there is difficulty in applying that holding to this case.

It is true that there has been much loose employment in American dividend law, both statutory and decisional, of the various phrases descriptive of the dividend fund—"net profits", "net earnings", "surplus profits", "surplus or net profits", and the like. It has been said that in dividend statutes all these terms are usually construed as meaning the same thing—a balance sheet surplus. Ballantine, *Corporations (Rev.Ed.),* p. 574. In this view, there was but one source of dividends under the former Delaware and New Jersey statutes, and a designation of the dividend source by any of the usual terms might be said to be a mere reference to the controlling statutory provisions.

But other writers have pointed out the difference in the meaning and implications of these phrases, as bearing upon the different tests prescribed by the various dividend statutes. See Weiner, *"Theory of Anglo-American Dividend Law",* 29 *Col.L.Rev.* 461; *Kehl, Corporate Dividends, Ch.* 2. The latter writer is of opinion that a more likely construction attributes to "net profits" some mean-

ing dissociated from the corporation's original capital.  P. 62.  Certainly it requires some stretch of construction to say that "net earnings", as a dividend source, is the equivalent of capital surplus.  And capital surplus, whether paid-in or reduction, may well have been a legal source for dividends under Section 35 of the former Delaware statute.  The point was discussed by Chancellor Wolcott in the *Wittenberg* case, but was not decided.  There is a very real difference, in business and accounting practice, between a dividend paid from current or accumulated earnings, and one paid from paid-in or reduction surplus.  And the distinction has been held to be of legal importance in determining the dividend rights of non-cumulative preferred stock.  See *Dohme v. Pacific Coast Co.*, 5 *N.J.Super.* 477, 68 *A.2d* 490.

Moreover, plaintiff argues with much force: If the framers of the charter had intended to incorporate the statutory language, why did they not do so?

Accordingly, defendant's contention that "net earnings" is equivalent to the statutory phrase—"surplus or net profits" is open to doubt.  In the view we take of this case, it is unnecessary to decide the question, and we do not decide it.  We shall assume that the source of the preferred dividends of the defendant is restricted to "net earnings", and that this phrase was used advisedly.

The second restrictive meaning that plaintiff seeks to attach to the phrase "net earnings" is that of accumulated earnings, *i. e.,* earned surplus.  This meaning, he says, necessarily excludes current earnings if there is no surplus.  This interpretation is drawn, by equating net earnings to net profits, from the judicial construction of the former Delaware and New Jersey dividend statutes.  The argument is, in effect that when the New Jersey corporation was formed prior or contemporaneous judicial construction of the phrase "net earnings" had attached to it the definite and restricted meaning of earned surplus and that its use in a corporate charter necessarily carried with it that restricted meaning.

This argument runs into difficulty at the start.  The assertion that the phrase "net earnings" has a fixed and settled meaning in

dividend law is not correct. With respect to the words "profits" and "earnings" it has been remarked:

> "There seems to be no settled usage regarding these terms in commerce, and the economists are at hopeless loggerheads." 29 *Col.L.Rev.* 474.

In statutes regulating the payment of dividends, the term has sometimes been held to be equivalent to surplus, and sometimes to current earnings, depending upon the background and context in which it is used. In *Mangham v. State,* 11 *Ga.App.* 440, 75 *S.E.* 508, 509, the statute forbade the declaration of dividends except from "the actual legitimate net earnings of its investments". *Pen.Code Ga.* 1910, § 740. The term was held to be a synonym for surplus. In effect the court read into the statute the general rule that dividends cannot be paid unless a surplus exists. However, in *United States v. Riely,* 4 *Cir.,* 169 *F.2d* 542, 543, involving the Virginia statute permitting dividends "out of net earnings, or out of * * * assets in excess of * * * capital", *Code Va.* 1942, § 3840, net earnings was held to mean current earnings, and therefore current dividends could be paid notwithstanding capital impairment. To the same effect is *Grand Traverse Hotel Co. v. United States, D.C.Mich.,* 79 *F.Supp.* 860, construing the Michigan statute.

These decisions illustrate the problem that has often arisen in the construction of dividend statutes—whether one or two funds are intended, and if two funds are intended, whether a surplus test is applicable to both. They support the statement above made, *viz.,* that "net earnings" standing alone, has no single or fixed meaning in dividend law. On this point, see also *Kehl, Corporate Dividends,* 26 and 26.1.

Unless there is some controlling authority to the contrary (a question reserved for later consideration), we are free to give to the term the meaning that appears most reasonably adapted to the context in which it is used.

Now, we are not confronted here with a question of statutory construction. The question concerns the meaning of the phrase "net

earnings" in the charter provisions creating the preferred stock. Is the phrase used in the restricted sense of earned surplus, so as to exclude current earnings if there is no surplus? Is it used in the restricted sense of current earnings only, so as to exclude accumulated earnings? Or is it unrestricted in meaning, so as to permit dividends to be declared from any earnings legally available?

Preliminarily it is to be noted that the word "net" is, for our present purpose, of little significance. It signifies merely what is left after subtracting one sum from another. What sum is to be subtracted and from what it is to be subtracted depends upon the nature of the fund out of which a particular dividend is declared. The question here is whether any restriction is intended by the reference to earnings as the source of the dividend.

We are dealing with preferred dividends expressly made cumulative. As applied to such dividends the natural meaning of earnings includes both current and accumulated earnings. This is necessarily so, because of the very nature of cumulative preferred stock; the current earnings are first to be devoted to its payment, and, if they are insufficient or if the dividend is passed, all future earnings are also charged with the dividend, and must be used to pay before any dividend can be paid on the common stock. This is the characteristic feature of cumulative preferred stock. In *Garrett v. Edge Moor Iron Co.,* 22 *Del.Ch.* 142, 194 *A.* 15, 17, there was presented the question whether the preferred stock of the Iron Company was intended to be cumulative. Chancellor Wolcott said:

> "Here the net earnings and surplus out of which the stipulated dividends were to be paid, were not the net earnings of each year to which each particular annual dividend was allocable. The dividends were chargeable against net earnings and surplus generally, which means for all time. Where such is the charter contract, the authorities are in unison in holding that the stipulated dividend is cumulative and is always payable ahead of dividends on subordinate stock, *whenever a lawful fund is available for distribution to stockholders."* [Emphasis supplied.]

■ The holding of the case is not in point here, but the last phrase of the quoted language suggests the underlying intent of the ordinary charter provision creating cumulative preferred stock. Certainly when the framers of this charter made the stock cumulative, they intended that the dividends should be currently paid if legally possible to do so. That the dividend statute then in force forbade the payment of any dividends while capital was impaired is in no way inconsistent with this general intention, nor did the statutory restriction affect the naturally broad meaning of the word "earnings" as contemplating the use of current earnings for dividends to whatever extent legally available.

In short the phrase "net earnings" in this charter does not necessarily import a restriction.

And we perceive no reason here for adopting a restrictive construction. The charter contains no negative or restrictive language of any kind. It is permissive in form. Nor is there any specific language from which the restriction urged by plaintiff can be inferred. Dividend restrictions are frequently met with, but they are ordinarily carefully spelled out, e. g., a restriction that out of profits a reserve or sinking fund must be established; a restriction that dividends shall be withheld or limited in amount while funded debt is outstanding; and the like. See 19 *Fletcher, Cyclopedia Corporation,* § 9032. Such a restriction, we suppose, is the kind primarily contemplated by the language of § 170.

Of course, there is nothing to prevent the framers of a charter from expressly providing that no dividends on cumulative preferred stock shall be paid except out of a surplus of assets over capital, or except out of earned surplus. But a self-imposed restriction of that nature, that is, a restriction operative apart from the statute, ought not to rest in implication. In cases like the one at bar it tends to impose an unreasonable hardship on the preferred stockholders. This view is approved by Ballantine and Hills in a discussion of "Corporate Capital and Restrictions Upon Dividends", 23 *Cal.L.Rev.* 229, 247-248. The result would be in many cases to saddle the corporation with a steadily increasing burden of accrued and unpaid dividends

despite the existence of current earnings from which dividends could be paid without further capital impairment. This result is manifestly undesirable. Why should such a restriction be read into the charter by implication?

This conclusion finds support, in this case, from the corporate history. In connection with a refinancing of funded debt the former bondholders of the New Jersey corporation accepted the original preferred stock in exchange for a large portion of their bonds, and agreed to a lower rate of return. They were also given control of the corporation. Assuming that they accepted a restriction excluding capital surplus as a source of dividends, we think it is unreasonable to conclude that a further restriction was intended. It is much more reasonable to say that they intended the meaning we have above attributed to net earnings—that the preferred dividends should be paid from any earnings legally available for the purpose.

We take up now the question noticed before and reserved for later discussion—whether there is any controlling authority against the conclusion already indicated.

Plaintiff insists that the New Jersey decisions foreclose the unrestricted interpretation of net earnings. The following cases are cited: *Park v. Grant Locomotive Works,* 1885, 40 *N.J.Eq.* 114, 3 *A.* 162; *Colgate v. United States Leather Co.,* 1907, 73 *N.J.Eq.* 72, 67 *A.* 657; and *National Newark and Essex Banking Co., etc. v. Durant Motor Co., etc.,* 1938, 124 *N.J.Eq.* 213, 1 *A.2d* 316.

(Parenthetically, we observe that for the purpose of developing this argument plaintiff has largely ignored the distinction, elsewhere insisted upon, between profits and earnings, and equates the two terms —an inconsistency illustrating the lack of any fixed and settled usage.)

The *Park* case [40 *N.J.Eq.* 114, 3 *A.* 163] involved a reorganization agreement (not a charter provision) providing for the issuance of stock (evidently common stock) to creditors as security for their debts. The agreement further provided that " 'all the net profits of the company' " after the payment of taxes, insurance and maintenance " 'shall be divided annually among the stockholders' ". The suit was

one to compel the payment of a dividend, and the defense was that certain securities appearing on the balance sheet were of little value and that the book surplus might be non-existent. The court held in effect that "net profits" was equivalent to surplus, and that the parties had intended to use the phrase in this sense, since it could not be supposed that gains that might never be realized were to be a source of profits.

The holding in this case falls far short of establishing, as settled law, the construction of "net earnings" for which plaintiff contends. At the most it is a holding that ordinarily net profits means surplus. It does not govern the question before us, which concerns a corporate charter defining the attributes of cumulative Preferred Stock.

The *Colgate* case is cited as holding that net earnings are synonymous with accumulated earnings and that the use of the phrase in a charter is intended to "regulate" the payment of dividends. We find no holding in the case to the effect that net earnings must necessarily mean accumulated earnings only. The case concerned the dissolution preferences of preferred stockholders upon consolidation or merger, and their right to require a distribution of earned surplus upon the consummation of the consolidation. It decides nothing to the point here.

The *National Newark* case, decided in 1938, presents no question of the interpretation of the term net earnings in a corporate charter apart from the statute. It merely construes the phrase "net profits" in the New Jersey statute as meaning a balance of assets over liabilities, and holds that because of the statute a dividend cannot be earned if there is no surplus.

These three decisions, which plaintiff cites as establishing a single fixed meaning for the term "net earnings", do not in our opinion bear out his contention. Certainly they do not establish the existence of any such settled rule prior to 1901, when the New Jersey charter of the Brick Company was amended.

The case of *Goodnow v. American Writing Paper Co.*, 73 *N.J.Eq.* 692, 69 *A.* 1014, indicates the lack of certainty that char-

acterizes the analogous phrase "net profits". And it is interesting to note that as late as 1925, Judge Learned Hand in *Borg v. International Silver Co., 2 Cir.,* 11 *F.2d* 147, held that the New Jersey act of 1904, as construed in the *Goodnow* case, permitted payment of dividends from "net profits", *i. e.,* current profits, despite an impairment of capital.

We are of opinion that there is no controlling authority inconsistent with the conclusion above set forth, *i. e.,* that the term "net earnings" in the Brick Company's charter is not restrictive of the use of current earnings for preferred dividends.

The use of current earnings is of course limited by any applicable statute. Formerly it was forbidden entirely if there was a capital deficit; now it is limited to earnings of the current and the preceding fiscal years. To the extent that the statutory prohibition is removed, the language of the charter may be given full effect. The Delaware statutory provision requiring a surplus having been withdrawn, there is no legal impediment to the payment of dividends from current earnings to the extent now permitted by the statute as amended.

We are aware that a different conclusion was reached in *Seiberling Rubber Co. v. United States, D.C.,* 115 *F.Supp.* 798, affirmed 6 *Cir.,* 207 *F.2d* 585. The District Court took the view that the accepted meaning of the phrase "net earnings" was "accumulated earnings", and that the charter provision was a restriction. The Court of Appeals affirmed, apparently relying on *Jones v. First National Building Corporation,* 10 *Cir.,* 155 *F.2d* 815, 816. The *Jones* case is distinguishable on its facts. It involved a Delaware corporation incorporated in 1930 under a charter providing that the preferred dividends were "payable out of the surplus". With the holding in the *Seiberling* case that net earnings necessarily means accumulated earnings we cannot agree, for the reasons above set forth. Before concluding this opinion we must notice some subsidiary arguments advanced by plaintiff.

It is said that if the charter phrase means current earnings, it would prevent the payment of any dividend out of earned surplus.

*Gallagher v. New York Dock Co., Sup.,* 19 *N.Y.S.2d* 789, is cited. That case concerned non-cumulative preferred stock, and is an example of the problems that often arise with respect to the liability of earned surplus for the payment of an annual dividend that has been earned but not declared. No such problem exists with respect to cumulative dividends. To reinforce this argument, plaintiff suggests that the Brick Company's charter does not provide that arrearages of dividends may be paid out of earnings of later years. If we understand this suggestion, it is an assertion that the stock is non-cumulative. On the contrary, the charter expressly provides that the stock shall be cumulative. As we have already said, this means that if a preferred dividend is passed it must be paid out of future earnings before any dividend can be paid on the common stock. This is elementary.

Plaintiff suggests some hypothetical questions, *e. g.,* for what period are current earnings available for dividends. This supposed difficulty appears again to stem from the assumption that the stock is non-cumulative and that accumulated earnings may not be used for dividends. This point we have already dealt with. In the absence of capital impairment any net earnings, current or accumulated, are available for the preferred dividend. If capital impairment exists, their use is limited by the present statute.

Plaintiff seeks to build some arguments on language culled from the Delaware cases dealing with the liquidation rights of preferred stockholders under various charter provisions. In *Gaskill v. Gladys Belle Oil Co.,* 16 *Del.Ch.* 289, 146 *A.* 337, the question was whether preferred stock was entitled to a preference on dissolution, no language to that effect appearing in the charter. Chancellor Wolcott held that they could not be paid from capital, the only source available, because the charter did not charge the dividends upon capital funds in the event of liquidation.

We are uncertain what use plaintiff seeks to make of this holding. Presumably he means that payment out of current earnings is a payment out of capital. But this is not so; the disbursement of current earnings for dividends leaves untouched the capital assets existing before payment. This is exactly what is contemplated by the present

statute. A somewhat similar rule has long prevailed in England. See *Ammonia Soda Co., Ltd. v. Chamberlain,* [1918] 1 *Ch.* 266, 281*ff.*

In *Penington v. Commonwealth Hotel Construction Corp.,* 17 *Del.Ch.* 394, 155 *A.* 514, 516, 75 *A.L.R.* 1136, decided after the 1927 amendment to the dividend section, the question was whether on liquidation the unpaid and accrued dividends on the preferred stock could be paid out of capital, there being no accumulated earnings. Some point is attempted to be made of the use by the court of the words "surplus or net profits", appearing in the charter, as contemplating a restricted source of dividends while the corporation was a going concern. The court, in a later part of the opinion discussing the same subject, also used the phrase "current or accumulated profits". Obviously nothing of significance here can be drawn from the use of these different phrases.

Plaintiff quotes from the case of *Garrett v. Edge Moor Iron Co., supra* [22 *Del.Ch.* 142, 194 *A.* 17], substantially the same language we have quoted above. Presumably the point plaintiff makes is that the reference to a general charge against earnings and surplus "for all time" is a holding that net earnings necessarily means earned surplus, and excludes current earnings. On the contrary, the Chancellor was merely saying that dividends were not limited to current earnings, and hence the stock was cumulative. What he also said was that arrears of cumulative preferred dividends may be paid "whenever a lawful fund is available". This is exactly what we have held this charter to mean, if we insert the words "from earnings" after the word "fund" in the quoted phrase.

Plaintiff asserts that the stockholders of the Brick Company have by practical construction adopted the restricted meaning for which he contends. This contention is based on an opinion of counsel, summarized in the company's annual statement, reading as follows:

> "The Company has been furnished with an opinion of counsel to the effect that accumulated dividends are payable only to the extent of surplus or net earnings, even in the event of liquidation."

This language does not purport to embody any specific construction of the phrase "net earnings" in connection with the pay-

ment of dividends while the company is a going concern. The real point of the footnote appears to relate to the liquidation preferences of the preferred stock.

Plaintiff asserts that the result of the Vice Chancellor's holding works unfairness to the common stockholders. This we cannot follow. On the contrary, as we have pointed out above, the withholding of current dividends from the preferred stockholders has an element of unfairness to them. And where is the unfairness to the common stockholders? Unless the dividends are paid they continue to accrue, and must be paid before any dividends are paid upon the common stock. So far as concerns the loss of common capital, why should it not fall upon the common stockholders?

■ The control of the corporation by the preferred stockholders is assailed as unusual and unfair. This is not correct, since a shift of control from common to preferred stockholders upon the existence of arrearages is one way of according special rights to preferred stock. See *Petroleum Rights Corporation v. Midland Royalty Corporation,* 19 *Del.Ch.* 334, 167 *A.* 835; *Ellingwood v. Wolf's Head Oil Refining Co.,* 27 *Del.Ch.* 356, 38 *A.2d* 743, 154 *A.L.R.* 406. In the case at bar, in consideration of a permanent surrender of some creditors' rights, the preferred stockholders were given permanent control. This does not seem unduly oppressive; but in any event it was agreed to and must be adhered to.

A question of constitutionality is discussed on the briefs. This question is raised by plaintiff upon the assumption that the Vice Chancellor's opinion held that the amendatory act of 1927 was an automatic amendment of defendant's charter. Since in our view the decision turns solely upon the meaning of the language of the charter, no question of constitutionality is presented.

We hold that the words "net earnings" in defendant's charter do not restrict the source of the preferred dividends to earned surplus. Payment from current earnings is lawful.

The judgment of the Court of Chancery is affirmed.