GEORGE R. WHITTAKER, assignee, complainant,

*v.*

THE AMWELL NATIONAL BANK et al., defendants.

1. Where the assignee of one of the directors of an insolvent corporation files a bill against the receiver of such corporation and others for the administration of both estates and for the marshaling of assets, and the receiver of such insolvent corporation answers and files a cross-bill, alleging that the directors of said corporation had declared and paid numerous dividends contrary to the statute which limits their liability for the payment of such illegal dividends to the period of six years prior to the commencement of the suit, it is competent for such receiver to show errors and falsifications of the accounts of such corporation at any reasonable time prior to the commencement of the period of six years within which suit to recover may be had.

2. In such case, although the receiver represents the corporation and produces its books of account, this does not prevent him from contradicting the entries therein for the reason that he represents creditors also.

3. Under the Corporation act, as revised in 1875, the directors of a corporation may execute to themselves mortgages to secure the actual or contingent liability of the corporation to them, even though this be done in contemplation of immediate application for the appointment of a receiver, and the lien secured thereby will be valid and prior to those of general creditors, which is contrary to the statute as it existed prior to the revision.

Whittaker v. Amwell National Bank.

4. One who declines to accept of the office of director of a corporation and declines to perform any duties thereof, cannot be regarded as a director simply because he was nominated therefor and formally elected.

5. The act of a corporation which depends for its validity upon proper notice to all of its directors, is not affected by want of notice to a person who has been nominated and elected as director but who has declined to accept the office and refused to perform any of its duties.

6. Where A, being secondarily liable, has taken collateral security from B, the principal debtor, and such security has been sold by the order of the court while in the hands of the receiver, A cannot compel the receiver to pay the proceeds of such sale to him until A has himself discharged the debt. In such case the court will order the receiver to pay the money directly to the principal creditor.

7. Where there are two funds, and A has a lien on both and B has a lien on one only, B can compel A to exhaust his remedy against the fund on which B has no lien, or to assign his lien to B.

8. A creditor who has claims against several insolvent estates for the same debt may prosecute his claim against each until the whole amount due him is satisfied.

9. Where a debtor assigns to different persons assets as collateral security for their claims, after such claims are satisfied, from whatever source, if any balance from such assets remain they are bound to return such balance to the debtor or to his representative.

On final hearing on pleadings and proofs.

*Mr. George W. Macpherson* and *Mr. Garret D. W. Vroom,* for the complainant.

*Mr. James Buchanan* and *Mr. William M. Lanning,* for the defendants.

BIRD, V. C.

The Star Rubber Company, one of the defendants in this suit, became insolvent and a receiver was appointed to wind up its affairs. Subsequently, Jonathan Steward, who was one of the directors of the Star Rubber Company, made an assignment for the benefit of his creditors. Mr. Steward, at the time of making his assignment, held large claims against the Star Rubber Company, and in order to ascertain their character and value, his assignee filed a bill against the receiver of the Star Rubber Com-

pany and numerous other creditors of the Star Rubber Company, including twenty-five national banks. This bill also aimed at a. complete administration of the claims of the creditors against Mr. Steward, and to a large extent necessarily involving the rights of the creditors of the Star Rubber Company.

The receiver of the Star Rubber Company filed an answer and an answer by way of cross-bill against the claim of the assignee of Mr. Steward as one of the directors of the Star Rubber Company, as well as against the other directors of said company, alleging that Mr. Steward and the other directors were personally liable, under the seventh section of the act respecting corporations, for the declaring and payment of dividends contrary to the provisions of the seventh section of said act. This section provides that—

"It shall not be lawful for the directors of such corporation to make dividends except from the surplus of net profits arising from the business of the corporation, nor to divide, withdraw or in any way pay to the stockholders, or any of them, any part of the capital stock of the said corporation, or to reduce the said capital stock, except according to this act, without the consent of the legislature, and in case of any violation of the provisions of this section, the directors under whose administration the same may happen, shall, in their individual and private capacities, jointly and severally be liable at any time within the period of six years after paying any such dividend to the said corporation and to the directors thereof, in the event of its dissolution or insolvency, to the full amount of the dividend made or capital stock so divided."

Semi-annual dividends were declared during the years 1887, 1888 and 1889, and one in 1890, amounting in all to over $68,000. The allegation is, that all of these were in violation of the statute referred to.

It is perhaps just to remark that there are many circumstances connected with this transaction which necessarily arouse very grave suspicion, and perhaps made it incumbent upon the receiver to make a most diligent investigation. For example: It appears that in the year 1881 the real estate and machinery, according to the books of the company, were valued at $62,000 and $67,000 respectively. At the close of the year 1886 they had been increased, according to the books, to $101,000 and $110,000 respectively, making, it will be seen, over $211,000.

At the period of the declaration of insolvency, the real estate had been advanced in value, by resolution of the board, $50,000. From time to time, between the years 1887 and 1890, these accounts had been credited with various sums besides the $50,-000, so that when the affairs of the Star Rubber Company came to the hands of the receiver its books exhibited a valuation of these two principal items of capital of over $286,000.

After what appears to me to be a very careful and elaborate inventory, made by the receiver, with the aid of a very intelligent, cautious and experienced expert, these two items are placed at $169,783.34, making a difference between the book value, as given, and the two items of real estate and machinery of over $116,000.

Besides these observations, which it is but fair to say must necessarily have attracted the attention of the receiver and all creditors of the Star Rubber Company, it is due to all concerned to add that when the real estate and machinery were sold, and sold as a plant, the highest bid which the receiver could get for them was $65,000, and this, too, after unusual efforts made and very extraordinary opportunities given to all persons in anywise interested to increase that bid, or to show cause why it should not be accepted and the sale for that consideration confirmed by the court. These observations make it quite apparent that the receiver had strong reasons for diligent inquiry as to the real basis upon which the directors made their dividends, while the market value of the plant during that period should depreciate so enormously in value.

It is alleged that Mr. Steward and seven others, directors of the said corporation, just upon the eve of dissolution of the Star Rubber Company, and with the view of an application to the court to have a receiver appointed, procured to be made to themselves mortgages upon the assets of said corporation to a very large amount, contrary to law and consequently injurious to other creditors, and fraudulent.

It is further alleged that if the execution of these mortgages was not in violation of well-settled rules of law, under the circumstances in which they were executed and delivered, yet they

are illegal as to creditors because they are not properly executed. The defect in this respect, it is alleged, consists in the fact that the meeting at which they were executed was a special meeting, and that only the directors who were interested in procuring the execution of these mortgages to themselves respectively attended the meeting, and that two other members of the board had no notice whatsoever of such meeting, and were not present.

I shall first consider whether or not the dividends so declared and paid were paid out of the surplus or net earnings of the company.

This proposition is to be determined by ascertaining the actual value of all the live assets of the company at the termination of six months, during which the supposed surplus or net earnings are said to have accrued. This can only truly be done by taking into the account the cost of repairs and also a reasonable allowance for depreciation for wear and tear or constant use, giving credit for all actual permanent improvements. The statute not only warrants but compels this course. The capital invested by corporations is all that creditors have for their protection. The legislature, which creates them and gives them favors which individuals do not have, imposes upon them the necessity of maintaining their capital to its maximum value before they can reap any benefit from the venture. In view of these statements, but against the protest of counsel for the assignee of Mr. Steward, testimony was admitted showing that, as above stated, in 1881 and 1882 the real estate and machinery accounts were valued at $62,000 and $67,000 respectively, and that at the end of the period of six months, during which the first dividend of $6,000 was declared, the real estate and machinery accounts had been advanced to $101,000 and $110,000 respectively. From this large increase in value, according to the books of the company, it was urged that a fraud had been perpetrated upon the creditors. It was thought at the time that such testimony was relevant; however, as will be seen, by no means controlling. I still think it was properly received, and in the view I find myself compelled to take of the case, of the highest importance.

To aid in a proper understanding of the case, besides the books of the company in which its accounts were kept, there is the testimony of expert witnesses.    One of these witnesses, Mr. Ridgway, who had been with the company for fifteen years, and for several years prior to 1882, as a mechanical engineer, says that during that year the entire plant was reconstructed, and that all of the old machinery except the grinders and calenders was cast aside and new machinery put in its place.    The account-books of the company make no mention of this significant and far-reaching fact.    This statement suffices to show that it is impossible for me to rely entirely upon the books of account of the company as a guide and do justice to the parties interested. According to the testimony of Mr. Ridgway, the old machinery that was cast aside was inventoried at over $47,104.    If it be said that this is an enormously large amount of old machinery to have been cast aside, the reply is, that that is only an inference, and that I cannot set at naught the positive statements of the witnesses by a mere inference.    Nor is it necessary that I should be guided by an inference rather than by direct and unimpeached evidence.    Neither am I required to place implicit confidence in the books.    The new machinery that was placed in the mill and the old machinery that was used therein after the 31st day of December, 1881, was nearly all, if not all, there at the time of the appointment of the receiver, and the price paid for it was known to Mr. Ridgway.    He not only knew the cost price of it but approximately the value added thereto when it was located ready for use in the plant.    Of these things he testifies.    There is much more certainty, therefore, in coming to a just conclusion by following his statements under oath than by adhering implicitly to the books, which were in no sense verified but which have been most seriously impeached.    The other experts, who were called by the directors to speak with reference to the value of the machinery, in the main, as will be seen hereafter, sustain Mr. Ridgway, or at least do not seriously conflict with him.

I shall therefore determine the validity of the dividends by the testimony of the experts rather than by the books.

The inquiry therefore will be, What was the fair value of the machinery on the 31st day of December, 1886, when the surplus or net profits were supposed to be $33,667, upon which the first dividend of $6,000 was declared? Mr Ridgway was called by the receiver to assist him in making an inventory and valuation upon the machinery. He rendered such assistance. When called as a witness, with this inventory in his hands, he was interrogated as to the value of the machinery, and fixed such value, being, as he said, the cost thereof to the company, at $49,723.13. After fixing the cost price, he said that the machinery, as there located ready for use, was worth very nearly $100,000. This includes the cost of the foundations and all other costs and expenses in placing or locating the machinery for actual use. The cost of the foundations he and one other of the experts fixed at $15,000, while the third makes it $20,700. This item of cost of foundations, however, should not be reckoned in the machinery account, because, as I believe from an examination, it has been placed in the real estate account.

Again, it must be remembered that the present object is to ascertain the value of the machinery on the 31st day of December, 1886, but Mr. Ridgway, in his estimate, values all of the machinery that was in the plant at the period of the appointment of the receiver, being an increase, according to the books, of over $19,000. Therefore, to ascertain the fair value on the 31st day of December, 1886, when the first dividend was declared, all that was added after that date must be deducted from the total value as given by the experts.

Hence, what is to be understood by the statement of Mr. Ridgway when he says the value of that machinery so located for use was very nearly $100,000? I am obliged to deal with that statement. In doing so I must have regard for the rights of creditors as well as of the directors. I can find nothing in the case to justify me in placing the valuation of all the machinery beyond $90,000. This is a liberal view, taking both the books and the testimony of Mr. Ridgway as a guide, deducting from the book value the value of the machinery which Mr. Ridgway says was cast aside at the period of the reconstruction.

Besides, if there is any uncertainty about it, neither the creditors nor the receiver are or is responsible.

Placing the whole value, therefore, at $90,000, there must be deducted therefrom the value of the foundations, $15,000, and the value of the machinery purchased after the 31st day of December, 1886, which was over $19,000, according to the books. These items aggregate $34,000; deducting them from the $90,000 and we have $56,000 as the value of the machinery at the time when the first dividend complained of was declared.

But the book value of the machinery at that time was, as above stated, $110,324.38, being $54,324.38 in excess of the true value, according to the testimony of Mr. Ridgway. This book value was of course carried into the trial balance and employed in making the surplus or net profits upon which the first dividend of $6,000 was declared. This supposed surplus or net profits appears upon the trial balance to be $33,667. This statement reduces the book assets more than $20,000 beyond the supposed surplus or net profits. So that in pronouncing judgment on this first dividend, I must conclude that it was declared in violation of the provisions of the statute.

Taking all the other items upon the trial balance as correct, except the one concerning machinery, was the value of that item so increased on all of the other balance-sheets, at the time of the declaration of all the other dividends complained of, as to justify such dividends? A brief statement will show the result.

The second dividend declared was $10,720, upon a supposed surplus or net profits of $38,099.66, upon a book valuation which had increased to $111,813.38, but upon a real valuation of $57,489, which shows that the book valuation was in excess of the true value the sum of $54,324.38, being over $16,200 in excess of the supposed surplus or net profits.

The third dividend declared was $9,530, upon a supposed surplus or net profits of $37,934, upon a book valuation which had increased to $113,717, but upon a real valuation of $59,393, which shows, as before, that the book valuation was in excess of the true value the sum of $54,324.38, being over $16,390 in excess of the supposed surplus or net profits.

The fourth dividend was $15,000, upon a supposed net surplus of $50,446.66, upon a book valuation which had increased to $116,513, but upon a real valuation of $62,189, which shows, as before, that the book valuation was in excess of the true value the sum of $54,324.38, being over $3,878 in excess of the supposed surplus or net profits.

The fifth dividend declared was $16,800, upon a supposed surplus of $40,905, upon a book valuation which had increased to $117,144, but upon a real valuation of $62,822, which shows, as before, that the book valuation was in excess of the true value the sum of $54,324.38, being over $13,419.38 in excess of the supposed surplus or net profits.

The sixth dividend declared was $11,424, upon a supposed surplus or net profits of $35,854, upon a book valuation which had increased to $124,096, but upon a real valuation of $69,771, which, as before, shows that the book valuation was in excess of the true value $54,324.38, being over $18,470 in excess of the supposed surplus or net .profits.

The seventh dividend declared was $8,568, upon a supposed surplus or net profits of $29,378, upon a book valuation which had increased to $129,362, but upon a real valuation of $75,037, which shows, as before, that the book valuation was in excess of the true value $54,324.38, being over $24,946 in excess of the supposed surplus or net profits.

It will be seen that all of the dividends except the last were declared at the expiration of every six months, or semi-annually, and the last at the expiration of a little over a year from the one immediately preceding. This last dividend was not declared until after the real estate had been advanced $50,000 by resolution of the board, as above described.

From the foregoing statements it must appear that all of the dividends declared were in violation of the statute. And since it has been shown that the directors were all present and participated in the meetings when such dividends were declared, and entered no protest, they are jointly and severally liable to the extent of the dividends so declared and paid.

But recurring again to the statement of Mr. Ridgway, to the effect that when the plant was reconstructed in 1882 all of the old machinery was set aside except the grinders and the calenders, and proceeding with that in view, and being guided solely by the books, after making the deductions which his statements justify, the result will not greatly differ from that above reached. The cost price of the grinders and calenders, from the testimony of the experts, was about $10,600. According to their testimony, the reasonable cost of locating the same for use would not exceed $10,000, making in all $20,600. The book value of the machinery, therefore, on the 31st of December, 1881, was $67,-704, only $20,600 of which was retained in actual use in reconstruction. This $20,600, and what was actually added after the 31st of December, 1881, and before the 31st of December, 1886, will give the full book value of the machinery at the last-named period. The value of the machinery added between those dates, according to the books, is $42,616, and the old machinery retained is the $20,600, making a total of $63,416. In the above calculation I reach the conclusion that on the 31st of December, 1886, the fair value of the machinery was $56,000; by the last calculation I make it $7,200 more, which shows that the book value at that date was $43,104.12 in excess of the true value. Allowing all the other items on the trial-balance to stand, this reduces the machinery account, on the 31st of December, 1886, so as to leave no surplus or net profits at the period on the 30th day of June, 1888, when the books show a surplus or net profits of $50,400. Taking this statement as true, there was then a net surplus of $7,780. In my judgment this should not stand, because it is fully overcome in the wear and tear of machinery and in the depreciation of real estate, and in the items of articles sold which have not been entered in the accounts, to which should be added the $5,500, the increase of the machinery and real estate account in the year 1882, which, so far as I can discover, was purely arbitrary.

It cannot be successfully contended that all such machinery is not subject to depreciation from wear and tear or actual use. That all machinery does not suffer alike is equally plain. Those

who deal in or use the different kinds are best informed as to the extent of depreciation in the different articles. The testimony in this case leads me to the conclusion that the depreciation was at least two per cent. a year. Detail is unnecessary, but calculation will show that if $5,000 be charged to this item it will be moderate. No testimony was offered showing the probable depreciatien in real estate of this character. Fourteen hundred dollars at least should have been credited in the machinery account for an article which was sold for $800, but which cost $2,200, and so appears in the account.

If I had made the first calculation on the basis of $100,000 valuation instead of $90,000, the result would not have differed very materially from the last calculation.

On this branch of the case it is eminently proper that I should say that the books of account of the company have not been established in the ordinary sense in which books of account are required to be established before they are received as evidence of what they contain. No person acquainted with the books during the period of time which they cover, and who had any general or special knowledge of the entries made in them, has been called to speak concerning their truthfulness. No clerk or secretary or other person authorized to make entries therein, or who actually made entries therein, or from time to time witnessed the making of entries therein, has been produced. Experts in bookkeeping have been called. One of these, with no little reason, insists that in making up the trial-balance which exhibits the supposed net surplus or earnings, entries have been falsely made; by means of which, such surplus or net profits have been unjustifiably increased. The other states, generally, that the books have been kept upon correct principles in all respects. Neither of these experts knew anything about the correctness of the different items which were entered in these books.

Under these circumstances, although the receiver represents the corporation whose books he brings into court, he is not bound by all the statements therein, because he represents creditors as well as the corporation.

It is also proper that I should make some observations respecting the testimony of Mr. Wilkes and Mr. Bates, the two experts called by the directors to fix the value of the machinery. I allude to Mr. Bates only because he, in a very general way, supported Mr. Wilkes, a mode of giving evidence which I regard as very unsatisfactory. Mr. Wilkes is no doubt a perfectly honest man, but in his testimony he exhibited not a little the enthusiasm of a salesman, and therefore I am free to say, lessened the influence which his testimony otherwise would have had; but I make reference to the testimony of Mr. Wilkes also in this connection rather for the purpose of showing that I am justified in not taking his estimate at the maximum by another circumstance which I have not heretofore alluded to. He says that he examined this plant with a view of purchasing it at the receiver's sale, and upon such examination he concluded that the machinery was worth from $120,000 to $130,000. Notwithstanding this estimate and his statement of the value of much of the machinery, that its value in the market was as much or more than that given to it by him, and as in the plant worth $90,000, he allowed the entire plant, including both real estate and machinery, to be sold at public vendue for $65,000. The real estate, according to the books, was estimated at $101,000. Adding this to his estimate of the value of the machinery when he examined it with a view of purchasing, and there is a value of $220,000 at least. It seems to me incredible that a fair-minded man, sufficiently well acquainted with business to speak, under oath, as an expert about such matters, should seriously consider purchasing a plant worth $220,000, and estimate the machinery at its market value at $90,000, should allow the whole plant to be sold for less than one-third of its value at public vendue. It is also plain that there is a great deal of uncertainty in the mind of this witness as to what part of such a plant is machinery and what part is real estate, and whether the water-power should be estimated in the one or the other.

For these reasons I am persuaded that his testimony should be qualified by what seems to me to be the clearer and more intelligent judgment of Mr. Ridgway.

The second disputed point is as to the validity of the ten mortgages executed by the directors upon the eve of application for the appointment of a receiver. Seven of these mortgages were to seven directors—one mortgage to each director, as will hereafter be seen—and three to as many different banks. The company was established by virtue of a special charter approved in the year 1872. By virtue of that charter it was authorized to mortgage its property to secure loans to the extent of $25,-000. At the time of the execution of the ten mortgages objected to, it had about exhausted its power to raise money by mortgage under the act referred to. It is therefore claimed that these ten mortgages were *ultra vires*, and since not for cash loaned but as security for previous advancements or against their own endorsements, they are void as to general creditors and cannot be enforced in equity. Whatever limitations the special charter creating this company may have imposed, it is my judgment that the revision of the Corporation law removes every such restriction and extends to this company the rights, powers and privileges which were by such revision intended to be given to corporations organized thereunder. The first section of the act (see *Rev. p. 175 § 1*) speaks of "every corporation," and declares that—

"Every such corporation shall have power to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited by its charter, * * * and to mortgage any real estate, with their franchises."

The one hundred and fourth section of this act (*Rev. p. 196*) declares "that all acts and parts of acts, general or special, inconsistent herewith, be and the same are hereby repealed." The plain object of the revision was to place all corporations upon the same footing. The first section does not say every corporation organized under this act, but every corporation. And the repealer is as broad as though every act inconsistent therewith had been named. I think a careful study of the decisions giving interpretation to legislative enactments of this general character will show that this is the view taken of them by the courts. *Bowyer* v. *Camden, 21 Vr. 87;* *Hoetzel* v. *East Orange, 21*

Whittaker *v.* Amwell National Bank.

*Vr. 354; Haynes* v. *Cape May, 21 Vr. 55; Mechanics' and Traders' Bank* v. *Bridges, 1 Vr. 112.*

It is insisted upon the part of the receiver of the Star Rubber Company that certain mortgages which were executed by that company to its directors and others are illegal and void as to creditors, because conceived in fraud and for the purpose of cheating, delaying and hindering said creditors. These mortgages were all made and delivered on the 22d of May, 1891, one to each of the seven directors, the total amount secured thereby being $396,400.

| | |
|---|---|
| One to the Trenton Banking Company.......................... | $1,975 |
| One to the First National Bank of Trenton......................... | 43,500 |
| (And to secure other advances not exceeding $50,000.) | |
| One to the Bordentown National Banking Company for........ | 32,700 |
| | $78,175 |

They were all recorded in the Mercer county clerk's office on the 25th day of May, at five minutes past twelve o'clock in the morning. It was stipulated in each of said mortgages that they should be concurrent liens. The mortgages to the directors were given to secure promissory notes on which they were either accommodation endorsers or accommodation makers, or for promissory notes held by them for money actually loaned. The amounts so secured to them by the said mortgages were as follows:

| | |
|---|---|
| Jonathan Steward......................................................... | $154,500 |
| Philip Dunn................................................................ | 56,000 |
| Thomas A. Bell............................................................ | 88,700 |
| William I. Vannest....................................................... | 47,200 |
| William Ivins............................................................... | 10,000 |
| A. V. Manning............................................................. | 10,000 |
| Mahlon Hutchinson...................................................... | 30,000 |

On the 28th day of the same month an application was made to this court by Jonathan Steward for the appointment of a receiver for the Star Rubber Company, and the defendant O. O. Bowman was appointed such receiver.

When all these conditions are taken into the account, the mind is forced to the conviction that the execution and delivery

of these mortgages was part of a plan to secure the mortgagees against the inevitable and legal consequences of a forced dissolution. Nothing is plainer than that it was foreseen by the company composed of the directors who executed these mortgages to themselves as mortgagees, that the company was in a state of irretrievable insolvency, and that unless they secured to themselves the bulk of the tangible assets their loss as creditors would be very great, and as the actual output has proved, simply enormous.

The eightieth section of the act respecting corporations provides that in making distribution of the funds of such insolvent corporation the receiver shall pay the

"creditors proportionately to the amount of their respective debts, except mortgage and judgment creditors, when the judgment has been by confession for the purpose of preferring creditors."

The act of which this is a revision included in the exception mortgagees as well as judgment creditors when a preference was intended. It would not only be inconceivable but marvelous why mortgagees should be omitted from the exception, if it were not understood that the omission was an oversight and in no sense intended by the revisors. It seems never to have been discovered until years afterwards. The omission is certainly unfortunate for a business-confiding community. It was doubtless this consideration that induced the counsel for the assignee of Mr. Steward to admit that a very great many authorities in this country denounced every such transaction fraudulent and void as against creditors. He insisted, however, as he justly might, that the decisions of the court of last resort in this state were to the contrary, and according to their interpretation these mortgages must be sustained. The cases referred to are those of *Wilkinson* v. *Bauerle, 14 Stew. Eq. 635;* *Bergen* v. *Porpoise Fishing Co., 15 Stew. Eq. 397.* See, also, the case of *Boehme* v. *Rall, 6 Dick. Ch. Rep. 542.* These cases sustain the mortgages made by the directors to themselves respectively, even though they absorbed everything and were executed as a preliminary step to a declaration of insolvency. The legislation upon the subject

makes this conclusion inevitable. The omission above alluded to compels the court to conclude, notwithstanding the explanation given as to the absence of the word " mortgagees " from the excepting clause, that the legislature intended to make a distinction between mortgages and judgments by confession, when such judgments were confessed for the purpose of preferring creditors, although a much simpler and easier method of accomplishing the mischief, and one which is altogether more likely to be resorted to under all circumstances, than that of obtaining a preference by procuring a judgment by confession. It seems to me that a mischief so glaring can only be remedied by legislative authority, being the authority which made provision tolerating it.

The claim that two of the members of the board of directors were not notified of the special meeting which authorized the execution of these mortgages, and were not present at such meeting, has not been sustained. The persons alluded to were not directors of the company ; although formally elected they did not accept the office in any manner, nor did either of them ever pretend to act in any capacity. Until there is satisfactory evidence of such acceptance in a formal manner, or by conduct in harmony therewith, no responsibility can be attached and no rights can be claimed by or through them.

Another disputed point is as to the direction which the court shall give to the moneys secured by these mortgages.

First, the banks are entitled to the amounts which shall appear to be due to each of them upon the claims intended to be secured by the mortgages given to them. What as to the funds covered by the other seven mortgages held by the directors ? I speak of funds, because, by the direction of the court, the receiver sold all the real estate and personal property of the Star Rubber Company, including that which was embraced in the said mortgages, reserving to the several mortgagees the same rights as against the funds that they were entitled to as against the real or personal property. It is conceded that the receiver must pay to the banks the amounts due upon their several claims so far as the assets secured by their mortgages will extend. But who shall make immediate distribution as between

the assignee of Mr. Steward and the receiver of the Star Rubber Company? Since all of the persons liable upon the notes secured by said mortgages have become insolvent and are represented by receivers or assignees, the principal question is, who is entitled to the money in the hands of the receiver of the Star Rubber Company, the proceeds of the sale of said real and personal estate, so far as the mortgages referred to are liens, in order to make final distribution thereof? For example: Jonathan Steward, one of said mortgagees, has made an assignment, and his assignee is the complainant in this suit. Mr. Steward became liable as accommodation maker or endorser for the Star Rubber Company to various creditors, for the sum of $154,500, against which accommodation he was intended to be secured by the mortgage given to him. These obligations given by the Star Rubber Company, and upon which Mr. Steward became liable, and which were outstanding and unpaid at the time of the appointment of the receiver of the Star Rubber Company, have been presented as just and valid claims to the receiver of the Star Rubber Company, and remain unpaid. The holders of such obligations have also filed claims for the amounts due thereon with Mr. Whitaker as the assignee of Mr. Steward.

Now, the receiver of the Star Rubber Company having these funds in hand, and claims having been made by the holders of these obligations, both against the Star Rubber Company and against the estate of Mr. Steward in the hands of his assignee, and such assignee having filed his bill in this court for the administration of these funds, ought the receiver of the Star Rubber Company be directed to pay the money which he shall be required to pay under the Steward mortgage to the original and real creditor, or to the assignee of Mr. Steward, who was only secondarily liable? The Star Rubber Company was the principal debtor and consequently first liable. Mr. Steward, being secondarily liable, has no rights whatsoever as against the Star Rubber Company, and could claim nothing until he altered his position by discharging the debt and putting himself in the position of a payee or obligee. Neither Mr. Steward nor his assignee can take a single step in advance against the Star Rub-

ber Company or its receiver until either Mr. Steward or his assignee discharges the obligations referred to. When that is done he becomes a creditor and may claim the rights which pertain to his position the same as any other creditor. It cannot be said that, because Mr. Steward held this mortgage that he was, by force of that instrument, a creditor to the amount of the various claims referred to therein, for it is expressly mentioned that it is given as collateral for certain endorsements. All that the assignee of Mr. Steward can claim by this bill is that there are certain equitable assets in the hands of the receiver of the Star Rubber Company which he is entitled to have applied to the liquidation of these claims, on which Mr. Steward is liable as well as the Star Rubber Company, and which the latter attempted to secure by the mortgage to the former, in order that he, as such assignee, may be enabled to make proper distribution of the assets which have come to his hands.

It is plainly the duty of the court to apply these funds directly, in discharge of the obligations of the Star Rubber Company, to the party primarily entitled, rather than to. risk their reaching that same destination in any circuitous manner. The real creditor is entitled to the funds, with as little delay as possible, without any unnecessary diminution thereof by way of fees or commissions.

I shall therefore advise a decree in accordance with these views. The authorities seem to be fully in harmony with this conclusion. It is quite well settled that every creditor may file his claim against as many different persons as are liable thereon, or in case of their death or insolvency, against their representatives, as he may desire, and press his claim until the whole amount is paid. *Byles Bills (6th Am. ed.) 439, 447; Chitty Bills (11th Am. ed.) 536, 722, 724; 34 Eden Bank. L. 155; Ex parte Wildman, 2 Ves. Sr. 113.*

The undoubted general rule is, that the holder of negotiable paper may pursue his remedies against all the parties liable thereon at the same time. *2 Pars. Bills & N. 457.* It would be absurd to say that his rights in this respect would be diminished by the insolvency of one or all of the parties so liable.

27

It is also safe to say that when the principal debtor has given to his surety, endorser or guarantor any portion of his estate as a protection against liability, and both become insolvent, the creditor is entitled to be subrogated to the rights of such surety, guarantor or endorser, and to claim directly and not through the representative of such surety, guarantor or endorser the application to the discharge of his claim of all such assets. *S held. Sub.* § *163; Harr. Sub.* § *550; New Bedford Institute* v. *Fairhaven Bank, 9 Allen 175; Aldrich* v. *Blake, 134 Mass. 585.*

Still another question is presented. Mr. Steward made assignment of certain securities which he held to different creditors as collateral security for their claims. What are their rights as against the general creditors of Mr. Steward? It is my judgment that they may file their claims with the assignee for the whole amount due them, without being compelled, in the first instance, to release their collaterals; but they are only entitled, as against general creditors, to a dividend out of the assets in the hands of the assignee, upon the balance of their claim after having received the value of such collaterals. *Stew. Dig. p. 388* ¶ *275* and cases cited; *Vandervere* v. *Conover, 1 Harr. 491; Moses* v. *Thomas, 2 Dutch. 128; Bell* v. *Fleming's Exrs., 1 Beas. 30; S. C., 1 Beas. 495.*

What is said by the court in the case of *Wilson* v. *Staats, 6 Stew. Eq. 531,* recognizes this principle. *Story Eq. Jur.* § *564 b.*

These cases proceed upon the old and long-established principle that where one creditor has two securities and others only one, the former must exhaust his claim to that which is entirely his own before he can resort to that which they hold in common. *Hudkins* v. *Ward, 30 W. Va. 204; Ellis* v. *Temple, 4 Coldw. 315; General Ins. Co.* v. *United States Ins. Co., 10 Md. 517; Woollen's Exrs.* v. *Hillon's Exr., 9 Gill 185; Jones* v. *Zollicoffer, 2 Hawks 623; Ramsey's Appeal, 2 Watts 228; Bank of Muskingum* v. *Carpenter, 7 Ohio 253; Terry* v. *Woods, 6 Sm. & M. 139.*

The cause will be referred to a special master to take and state the accounts of the different assignees and receivers according to the practice of the court, and to report thereon.