This suit to foreclose a mortgage securing bonds in the par amount of $770,000, duly proceeded to decree and sale. But no substantial bids were made, although the sale was several times adjourned. Finally, however, the master received a bid in a nominal sum, but containing an agreement that the bidder would cause a corporation to be formed to take title to the property, and that the corporation would secure by mortgage the fees and expenses of the trustee-complainant, its counsel and the receiver who had been appointed in the cause, and also that the corporation would issue "to the bondholders under the trust mortgage preferred stock limited in amount and having an aggregate par value *Page 215 
of $770,000, each bondholder to receive in stock an equivalent par amount to the principal of his bonds, which said stock is to have no voting power and is to be entitled to non-cumulative dividends at six per cent., to be paid only to such extent as it shall be earned in any fiscal year, and which said stock upon the dissolution of the corporation, or the sale of the corporate assets, is to be paid in full prior to any payments being made to any other classes of stock and which said stock is to be redeemable at the opinion of the corporation at any time upon the payment of the par value thereof, plus proportionate dividends, if any. Provision is to be made for meeting of the preferred stockholders, and if two-thirds of those present and voting at such meeting shall vote to reduce the amount at which it may be redeemed, the redemption price of all the preferred stock shall be reduced accordingly. Unless two-thirds of the preferred stockholders voting at any such meeting shall so approve, no other class of stock is to be issued with any rights prior to those provided for hereinabove, over such preferred stock."
The bid, including the agreement, was approved and accepted by order of November 27th, 1933. A new corporation. Waverly Terminal Company, was organized, accepted an assignment of the bid and received from the master conveyance of the property. The mortgages were executed as agreed and have been paid off. Now the Terminal Company petitions the court to approve a suggested form of preferred stock certificate and to fix the method of the issuance and delivery of the preferred stock to the old bondholders. Holders of $10,000 par value of the bonds make sundry objections.
The first objection is that the Terminal Company should have proceeded by bill instead of by petition and order to show cause in the foreclosure suit.
A successful bidder at foreclosure sale, or his assignee, makes himself a party to the foreclosure cause. Other parties may proceed against him by petition in the cause to compel specific performance of his contract; or to set aside the sale; or the bidder may petition for relief, such as cancellation of his bid.Morrisse v. Inglis, 46 N.J. Eq. 306; Boorum v. Tucker,51 N.J. Eq. 135; Cropper v. Brown, *Page 216 76 N.J. Eq. 406; Murphy v. Skelly, 101 N.J. Eq. 793; Fuchs v.Syndicate Realty Co., 107 N.J. Eq. 506. A sheriff's sale may be set aside on petition and without bill, after the sale has been carried into effect by the delivery of a deed, and even after the purchaser has reconveyed to a third party. Hinners v.Banville, 114 N.J. Eq. 348.
By the petition now before me, the Terminal Company, as assignee of the bid, seeks the aid and instructions of the court in fulfilling the terms of the bid. The procedure adopted is proper.
Objectors next say that the court's guidance in drafting the stock certificates is unnecessary and should be denied since petitioner's duty is merely to copy into the stock certificates the language of the bid quoted above; that any additions, omissions, or alterations would constitute in greater or less degree, a departure from the terms of the contract between the parties. Whether this is so depends on the intention disclosed by the agreement. Inspection of the agreement convinces me that it was never intended to copy the words of the agreement verbatim
— or even approximately — into the stock certificate. Note, especially, the clause, "Provision is to be made for meetings of the preferred stockholders." Clearly it was not contemplated that the clause be inserted in the stock certificate, but rather that the petitioner and its counsel should devise and embody in the certificate apt language in fulfillment of the stipulation.
The bid-agreement contains the gist of certain important terms of the preferred stock, to be expressed in the certificates in language more artistic and exact. Other reasonable provisions, not in conflict therewith, may be inserted at the option of petitioner. Petitioner has properly endeavored, in drafting the certificate, to state the rights of the preferred stockholders with precision, to the end that future litigation may be avoided. The question for decision is whether the preferred stock which petitioner proposes to issue fits the description contained in the agreement. If it does fit, if it secures to preferred stockholders the rights which were promised to them, the proposed certificate will be approved.
The objecting bondholders rely on American Trading and *Page 217 Importing Co. v. Miron Lifson, 98 N.J. Law 737. That was an action on a stock subscription agreement. Although nothing appeared in the agreement about redemption of the stock, the company so issued the stock that it was subject to redemption. The court held that this was a material departure from the terms of the agreement and released the subscriber. That decision does not, however, indicate that the stock certificate should not contain usual and suitable provisions which are consistent with the agreement.
The controversy on the merits is confined to the following paragraph in the draft certificate, in which I have italicized the provisions to which exception is taken:
"The holders of the preferred stock shall be entitled to receive, when and as declared by the Board of Directors, preferential dividends at the rate of six per centum per annum and no more, which shall be non-cumulative except to such extent as the dividend may be or may have been earned in any fiscal year, from December 1st, 1933. For the purpose of determining whether the dividend upon the preferred stock has been earned in any fiscal year there shall be deducted from the corporation's gross income for each fiscal year (excluding therefrom, however,any profit, income and proceeds resulting from the sale or otherdisposition of any of its capital assets or from the settlementor acquisition by the corporation of any of its capitalsecurities or other obligations) the following items (1) to (7), both inclusive: (1) All real estate, personal property, franchise, income, profits and other taxes and governmental charges with respect to the corporation, its assets or its business, accruing in such fiscal year. (2) All wages, salaries and other compensation of the corporation's executives, officers, directors and other employes and agents, including accounting and legal expenses, whether in any case paid or accrued. (3) All interest paid or accrued upon obligations of the corporation and upon taxes which are liens upon property owned by the corporation. (4) All expenses properly incurred by the corporation for repairs, replacements, alterations, to the property of the corporation. (5) All water rent, all premiumsupon insurance written for the benefit of the corporation and aproper depreciation of the corporation's assets. (6) All other expenses properly incurred by the corporation in the operation of its business. (7) An amount equal to the net operating loss, ifany, accumulated since December 1st, 1933, as the same shallappear upon the books of the corporation at the beginning of eachsuch fiscal year. The net operating loss, as used herein, is defined as the excess, if any, of the aggregate of the deductions provided in items (1) to (7), both inclusive, over the corporation's gross income, excluding the profits, income and proceeds hereinbefore mentioned, in any fiscal year. The term `fiscal year,' as used *Page 218 
herein, is defined as the fiscal year of the corporation as the same may be fixed from time to time. If any accumulated dividend upon the preferred shares shall at any time be unpaid, then no dividend shall be paid upon any other shares of the corporation."
One defect of this paragraph — although probably unintentional — is the discrimination implied between preferred and common stockholders in ascertaining profits. The result is possible that some year, although no preferred dividends would be earned, there might be profits from which a common dividend could be declared. This possibility should be avoided. Whatever is gross income or net profits for the one, must be considered gross income or net profits for the other class of stock; in this regard, the agreement which is the basis of their rights makes no distinction. The phrase which introduces the definition of net income should be amended to read: "For the purpose of determining whether a dividend upon any class of stock has been earned,"c. Or counsel may hit upon some other phrase to secure against discrimination in the calculation of earnings.
Petitioner desires to exclude from income available for dividends, profits from the sale of capital assets, or from the settlement or acquisition of any of its capital securities or other obligations. Profit from the sale of a capital asset — unless the company be in liquidation — enters into earnings or surplus account and is a proper source of dividends. Hyams v.Old Dominion Copper, c., Co., 82 N.J. Eq. 507; 83 N.J. Eq. 705.
The result of settlement of a debt at a discount depends on the origin of the debt. If it was incurred as an operating expense, then the settlement produces an operating credit and affects profit and loss. The purchase of shares of the company's own stock and resale at an advance would, of course, produce a profit.
The parenthetical clause to which exception is taken will be struck out.
The petitioner, in framing that clause, had probably in view the taxes encumbering the property when it took title, and the expenses which it agreed to secure by mortgage, and the bonds and the preferred stock now to be issued. At the time of the master's sale, the tax lien amounted to $550,000; *Page 219 
the fees and expenses to be paid were about $120,000 and the bonds were selling at four cents on the dollar. It was scarcely hoped that the bondholders would eventually receive par for their securities, and so the agreement provides conditionally for redemption of the preferred stock at less than par.
I suppose when the petitioner took over the property, it stated the cost on its books as the sum of the items I have indicated, including the bonds at par. If it is able to compromise the taxes or the fees, or if it buys and retires bonds or shares of preferred stock at a discount, it might be said that a profit results. But it would be more accurate to say that the purchase price of the warehouse turns out to be less than anticipated; the saving should be shown by an adjustment of the property account, and the surplus account remain unchanged. The same would be true of the compromise of any debt which originates as a capital expense. A balance should be reached by reducing the cost of the asset represented by the debt. There may be a profit eventually when the property is sold, but not until then. Remember that this whole matter, from the foreclosure sale on, has been essentially a salvage operation.
In many ways it would be more satisfactory to deal with such problems whenever they may arise hereafter, instead of attempting to devise a formula to be inserted in the stock certificates. But the answer to them at present depends somewhat on the situation existing at the foreclosure sale, as an aid to interpretation of the bid-agreement. The stock certificates about to be issued will be practically negotiable instruments. The holders' rights should be stated in the certificates and not dependent on matters inpais which may be unknown to them.
If petitioner so elects, there may be inserted in the stock certificates a provision somewhat as follows:
For the purpose of making dividends on any class of stock, no profit or surplus shall be considered to result from the compromise of any lien which encumbered the company's property at the time it was acquired, or of any obligation incurred for capital purposes, or from the retirement at less *Page 220 
than par of any preferred stock, or bonds which were exchangeable for such stock.
Objection to deduction from gross income, of insurance premiums and depreciation, is frivolous. Directors would be derelict in their duty if they did not insure and provide for depreciation.Whittaker v. Amwell National Bank, 52 N.J. Eq. 400.
The last question arises from the provision for deduction of accumulated loss. To be specific: From the beginning of operations December 1st, 1933, to December 31st, 1937, there was a loss of $232,863; assume that there will be a profit of $50,000 in 1938, reducing the deficit that much. Would the preferred stock earn a dividend in 1938?
The objectors recognize, of course, that no dividend can be paid while the deficit remains; but they say that in each year which, taken by itself, shows a profit, a dividend is earned and must be carried forward to a time when there is a fund from which it can be paid.
Our statute forbids the payment of dividends except from surplus or "from the net profits arising from the business of the corporation." Rev. Stat. 14:8-19. In my opinion, no dividends out of net profits are earned until there is a balance of assets over liabilities, arising from the business of the corporation. Though the company be $50,000 better off at the close of 1938 than at the beginning, yet there will be no net profits at the end of the year, but only a smaller deficit. No dividend is earned in any year unless the operations for that year produce a fund (which need not be cash) which may some day be available for the dividend. The hoped-for profits of 1938 can never be used for dividends, but must be applied to prior losses. The clause in the draft stock certificate, relating to accumulated losses, is approved. *Page 221