[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 479 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 480 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 481 
These four cases involving the dividend rights of stockholders of the Pacific Coast Company were brought to enjoin the company from paying dividends of $4 per share on the second preferred stock and $1 per share on the common stock declared out of the 1947 net earnings. The first preferred stockholders claim that, before payment of any dividends on the second preferred stock or the common stock, they are entitled to be paid dividends which could have been, but were not, paid out of profits or surplus for the years 1935 to 1947 inclusive. The second preferred stockholders claim a similar priority before dividend payments to the common stockholders.
The common stockholders denied such claims and counterclaimed for a determination of the rights of the various classes of stock and for a permanent injunction against the declaration or payment of any dividend except in accordance therewith. A preliminary restraint issued against the payment of the aforesaid 1947 dividends. In December, 1948, the company declared like dividends out of the 1948 net profits, payment whereof was by stipulation restrained.
The Pacific Coast Company was incorporated in 1897 under the laws of this State, to acquire the assets of the Oregon Improvement Company, a corporation of the State of Oregon, pursuant to a plan of reorganization of said company, which had defaulted in the payment of its outstanding bonds. The company was authorized to issue capital stock in the sum of $12,525,000, divided into three classes: 15,250 shares of non-cumulative first preferred stock, 40,000 shares of non-cumulative *Page 483 
second preferred stock and 70,000 shares of common stock — all of $100 par value. The first preferred stock was to have first preference as to dividends to the amount of 5% per annum and to be entitled to no other or further dividend or preference. The second preferred stock was to have second preference as to dividends to the amount of 4% per annum and thereafter the common stock to the amount of 4% per annum; and if in any year dividends in excess of these were to be paid, the second preferred and the common stocks were to share ratably in such excess. From its organization until the year 1921, the company annually earned substantial profits and paid dividends. However, in the ensuing twelve years, the company suffered losses in eight years and reduced profits in four years. During the period, the only dividends paid upon the first preferred stock were 2 1/2% in 1924, 5% in 1925, 1926 and 1927 and 1 1/2% in 1928; upon the second preferred stock, 1% in 1925, 4% in 1926 and 1% in 1927; and none upon the common stock.
In consequence of this period of reverses, the company in 1932 had its property and the property of its subsidiaries appraised, with a resulting valuation of $7,373,899.99. The company had outstanding stock of an aggregate par value of $12,525,000 and bonds amounting to $4,000,000. There was therefore a substantial impairment of capital. Accordingly, the company took steps to reduce its capital and capital stock. By action of the board of directors approved by more than two-thirds of the stockholders, the capital of the corporation was reduced and the Certificate of Incorporation amended on June 27, 1933. By such amendment each share of first and second preferred stock of $100 par value was converted into a share of no par value first or second preferred stock of a stated value of $10 per share; and each share of common stock was reduced in par value from $100 to $10. In lieu of the original dividend provisions expressed in percentage, the amended Certificate of Incorporation provided for like dividends in terms of dollars. Whereas the original Certificate of Incorporation made no express provision for distribution of assets, the amendment expressly provided that except as to *Page 484 
dividends all shares should share ratably, without preference or priority. In this respect the amendment did not alter the stockholders' rights, but made more explicit a provision of the original certificate. The rights of the stockholders inter sese
remained undisturbed.
Article Fourth of the amended Certificate of Incorporation reads as follows:
"IV. The amount of the total authorized capital stock of the Corporation is one hundred twenty-five thousand two hundred fifty (125,250) shares. The number of such shares that are to have a par value is seventy thousand (70,000) shares and the par value thereof is Ten Dollars ($10) each. The number of such shares that are to be without par value is fifty-five thousand two hundred fifty (55,250). The shares of the Corporation are divided into fifteen thousand two hundred fifty (15,250) shares, without par value of the First Preferred Stock, forty thousand (40,000) shares without par value, of the Second Preferred Stock, and seventy thousand (70,000) shares, of the par value of Ten Dollars ($10) each, of Common Stock.
"The amount of capital stock with which the Corporation will commence business is One Thousand Dollars ($1,000).
"The fifteen thousand two hundred fifty (15,250) shares of First Preferred Stock, of the par value of One Hundred Dollars ($100) per share previously authorized and issued, are hereby changed into fifteen thousand two hundred fifty (15,250) shares of First Preferred Stock, without par value, and the forty thousand (40,000) shares of the Second Preferred Stock of the par value of One Hundred Dollars ($100) per share, previously authorized and issued, are hereby changed into forty thousand (40,000) shares of Second Preferred Stock, without par value.
"The par value of the Common Stock, of the par value of One Hundred Dollars ($100) per share, is hereby changed and reduced to Ten Dollars ($10) per share.
"The First Preferred Stock shall have a first preference as to dividends to the amount of $5 per share per annum, which shall not be cumulative; that is to say, the First Preferred Stock in any year shall be paid $5 per share in dividends before any dividend is paid upon the Second Preferred Stock or the Common Stock. The First Preferred Stock shall be entitled to no other or further dividend or preference.
"The Second Preferred Stock shall have a second preference as to dividends to the amount of $4 per share per annum, which shall not be cumulative; that is to say, the Second Preferred Stock in any year shall be paid $4 per share in dividends before any dividend is paid upon the Common stock, but shall be entitled to no other or further preference.
"After the payment of $5 per share upon the First Preferred Stock and $4 per share upon the Second Preferred Stock in any year, the *Page 485 
Common Stock shall next be entitled to $4 per share in dividends; and if in any year dividends in excess of $5 per share upon the First Preferred Stock, $4 per share upon the Second Preferred Stock and $4 per share upon the Common Stock be paid, both the two classes of stock last named — to wit, the Second Preferred Stock and the Common Stock — shall share ratably in such excess, each share of stock receiving the same part thereof as any other share, whether the same be Second Preferred or Common Stock.
"The dividends upon the First Preferred Stock and Second Preferred Stock shall be paid quarterly, half-yearly or yearly, as the Board of Directors shall from time to time determine.
"Except as aforesaid, the First Preferred Stock, the Second Preferred Stock and the Common Stock shall share ratably, share for share, in any distribution of assets, without preference or priority of any class of such stock over any other class."
The revaluation of the property and the reduction in capital were part of a single plan of recapitalization. This having been accomplished upwards of sixteen years ago, with the approval of more than two-thirds of the stockholders and without objection from any, all stockholders are held to have acquiesced in and ratified the procedure. The consequence of the reduction in capital was the wiping out of the capital deficit and the creation of a capital surplus of $11,272,500 set up on the books of the company. Such surplus was not a source for the payment of dividends to preferred stockholders, but could among other lawful purposes be used to absorb future losses and, in the event of a distribution of assets, be shared ratably among the stockholders, without preference or priority, as provided in the charter.
From 1933 to 1947, although the company earned profits in eleven years, in eight of them no dividends were paid, the only dividends being in 1945, 1946 and 1947 when $5, $2.50 and $5 were paid to the first preferred stockholders. In the other eight years, the company retained its earnings and used the funds for the purchase of its bonds below face value. Accordingly, when out of the 1947 net profits the company declared dividends on the second preferred stock and the common stock, these actions were instituted.
The parties agree that the accounting is complex and that upon a declaration of principles, the respective amounts to *Page 486 
which the various classes of stock may be entitled can be ascertained either by the accountants or by a reference.
The issues raised are:
"I. What are the respective rights of the various classes of stock with respect to dividends?
"II. (a) Did the application of retained profits for the purchase by the company of its own bonds affect the dividend rights of the preferred stockholders?
"(b) Are the gains resulting from the acquisition of its bonds available for the payment of preferred dividends?
"III. Should annual net earnings be determined on a consolidated or a non-consolidated basis?
"IV. Should the property of the corporation for purposes of depreciation be valued on a basis of historical cost or at its 1932 appraised valuation."
 I.
It is firmly established that the Certificate of Incorporation and the amendment thereof constitute a contract between the corporation and its stockholders, and among the stockholdersinter sese; that earnings remain corporate property until a dividend is declared; and that the declaration of a dividend is subject to the sound discretion of the board of directors.
The principles pertinent to this case have recently been expounded by our Supreme Court in Agnew v. American Ice Co.,2 N.J. 291 (Sup. Ct. 1949), relying upon the earlier cases ofBassett v. U.S. Cast Iron Pipe Foundry Co., 75 N.J. Eq. 539
(E. A. 1909); Moran v. U.S. Cast Iron Pipe Foundry Co.,95 N.J. Eq. 389 (Ch. 1924); affirmed, 96 N.J. Eq. 698 (E. A. 1924); Day v. U.S. Cast Iron Pipe Foundry Co.,95 N.J. Eq. 389 (Ch. 1924); affirmed by an equally divided court,96 N.J. Eq. 736 (E. A. 1924); Cintas v. American Car Foundry Co., 131 N.J. Eq. 419 (Ch. 1942); affirmed,132 N.J. Eq. 460 (E. A. 1942).
Dividends are payable from surplus or from net profits arising from the business of the corporation. R.S. 14:8-19. The charter in the instant case does not specify the source from which dividends are to be paid. Therefore the sources are those permitted by law. Whenever dividends *Page 487 
are declared from "surplus" or from "net profits arising from the business of the corporation," the preferred stock to the extent to which it is entitled to priority shall be paid from such sources before junior stockholders are paid. The statute itself does not appear to make any distinction between "capital surplus" and "earned surplus" as sources for the payment of dividends. Controlling cases in this State construing the statute and charters with similar provisions as here involved, do, however, confine the source to earned surplus funds.
Cumulative dividends must be paid regardless of the year in which they are earned, while "ordinarily, the adjective `non-cumulative' serves to restrict the dividend source to earnings of a particular year. It signifies that unless there are earnings in a given year, there is no right to dividends for that year, either then or later * * * and, in the absence of a contrary stipulation, such dividends if not payable for want of profits in the particular year, are not chargeable to the profits of a succeeding year and payable thereout to the prejudice of the common stockholders." Agnew v. American Ice Co., supra. The earnings of each year must be considered separately to determine the rights of the non-cumulative preferred stockholders. "No dividend is earned, in any year, unless the operations from that year produce a fund (which need not be cash) which may some day be available for the dividend." National Newark Essex BankingCo. v. Durant Motor Co., 124 N.J. Eq. 213, at p. 220 (Ch.
1938); affirmed, 125 N.J. Eq. 435 (E. A. 1939). In any given year when there are profits arising from the business of the corporation and the directors in their discretion declare a dividend out of the annual net profits, they are to be allocatedpro tanto to the various classes of stockholders in accordance with their seniority and to the extent stipulated in the charter. Here, the first preferred stockholders are entitled to a dividend in the amount of $5 per share out of such annual net profits to the extent that a dividend can be paid thereout, before any dividend may be declared and paid to the second preferred and common stockholders, and the second preferred stockholders are entitled to a priority of $4 per share over the common stock. *Page 488 
If in a particular year the full dividend of $5 per share out of the annual net profits has been paid to the first preferred stockholders, they have no interest in the balance of the earnings of that year. The excess is available for dividends on the second preferred stock and the common stock. It is so provided in the amended Certificate of Incorporation, Thus, — "the first preferred stock shall have a first preference as to dividends to the amount of $5 per share per annum, which shall not be cumulative; that is to say, the first preferred stock in any year shall be paid $5 per share in dividends before any dividend is paid upon the second preferred stock or the common stock. The first preferred stock shall be entitled to no otheror further dividend or preference * * * if in any year dividends in excess of $5 per share upon the first preferred stock, $4 per share upon the second preferred stock and $4 per share upon the common stock be paid, both the two classes of stock last named, to wit, the second preferred stock and the common stock, shall share ratably in such excess, each share of stock receiving the same part thereof as any other share, whether the same be second preferred or common stock." (Italics added.) Under the charter in this case, each class of stock has a definite interest in the annual net earnings. "A loss in one year does not affect the preferred right to a dividend in the succeeding year in which there is a profit and it does not erase their right to profits earned but not divided in a prior year." Agnew v. American IceCo., 142 N.J. Eq. 578 (Ch. 1948), reversed on other grounds. The first preferred stockholders having received their full dividend of $5 per share out of the annual profits for the years 1947 and 1948, they have no further interest in the excess which belongs to the junior stockholders, and any unpaid dividends owing to the first preferred stockholders for prior years cannot be paid out of the annual profits of succeeding years belonging to the junior stockholders. Dividends belonging to one class of stockholders may not be used for the payment of dividends to another. "One cannot encroach on the other's for dividends." Dayv. U.S. Cast Iron Pipe Foundry Co., supra. "To yield to the contention of the complaint *Page 489 
would be to permit the directors of the corporation to defraud" the second preferred stock and the common stock for the benefit of the first preferred stock. Bassett v. U.S. Cast Iron Pipe Foundry Co., supra.
A distinction is to be drawn between "earned surplus" and "capital surplus," as a source for the payment of dividends. When the directors of a corporation in a year when there are annual net profits available for the payment of dividends, in their discretion fail to direct such payment and add the net earnings to surplus, the inchoate right of the non-cumulative preferred stockholder is not lost, but is transferred to said surplus funds which remain available for dividends so far as they represent moneys so retained. "Dividends earned but withheld and retained as surplus and not utilized in the corporate business, are required to be paid on the preferred stock before there can be a dividend distribution on the common stock. The corporation may not pay dividends on the preferred stock from a reserve fund accumulated from earnings which would otherwise be payable as dividends to the holders of the common stock; but `where the reserve fund is accumulated in whole or in part by the cutting down of dividends which would otherwise have been paid to preferred stockholders, the fund, so far as it represents moneys so retained, is available for the payment of subsequent dividends upon preferred stock.' Bassett v. U.S. Cast Iron Pipe FoundryCo., supra. This is the principle of the provision of the articles of incorporation cited supra. Annual net earnings may not be withheld from the preferred stockholders and devoted in later years to the payment of dividends on the common stock. The preferred stockholders are entitled to the payment out of the surplus of moneys earned but unpaid upon their stock before payment of dividends on the common stock." Agnew v. American IceCo., supra. "So far as that fund (surplus) is made up from moneys which would otherwise have been paid to the preferred stockholders * * * it is available for the purpose of paying the dividend, which is the subject of this controversy." Bassett v.U.S. Cast Iron Pipe Foundry Co., supra. *Page 490 
"Whatever part of such dividend has been earned, less whatever dividend has been declared and paid or set apart upon the non-cumulative preferred stock, although it may be used in the corporate business, must be segregated on the books for the benefit of such preferred stock. It can never be distributed as dividend to the common stock. * * * All or part of the dividends earned but not paid to the preferred stock may be paid at any later time to the preferred stockholder out of the preferred surplus fund." A.A. Berle, Jr., Non-Cumulative Preferred Stock,
23 Columbia Law Review 357 et seq. (1923). The inchoate right of the non-cumulative preferred stockholder to dividends out of surplus funds is both qualified and limited. It is qualified in that it attaches to that part of the surplus which comprises annual net profits and is limited to so much of the annual net profits which could have been applied to the payment of dividends in the year in which the profits were earned. Therefore, so much of the surplus as comprises annual net profits available in past years for dividends, but withheld, is charged with the same dividend rights as the respective stockholders would have had if the dividends had been declared and paid in the respective years.
 II.
When the company was incorporated in 1897, it issued its fifty-year 5% mortgage bonds, due and payable on June 1, 1946, in an amount of $5,000,000. All such bonds, except an aggregate face value of $564,000, were distributed pursuant to the plan of reorganization to the creditors and security holders of the Oregon Improvement Co.; the $564,000 in bonds were sold and the proceeds applied to the purchase of steamships. The corporation never defaulted in the payment of interest on the bonds.
From 1932 to 1945 inclusive, the company purchased considerable amounts of its bonds at very decided discounts, varying from 20% of face value upward. There is nothing in the record to suggest that the bonds were not worth their face value at the time of issuance or that at the time of purchase *Page 491 
the assets of the company did not exceed the value of the bonds. Earnings which would have been available for the payment of dividends were used in the acquisition of these bonds. The president of the company testified that every available dollar was used for the purchase of the bonds, in order to avoid foreclosure of the mortgage when it became due, but he disclaimed insolvency. The corporation reported the bond gain as income for tax purposes.
Two questions are raised: (a) whether the use of annual net profits for the purchase of the bonds constituted such a utilization in the corporate business as would deprive the non-cumulative preferred stockholders of their inchoate right to dividends and (b) whether the preferential right of the non-cumulative preferred stock applies to the gains on the purchase of the bonds below face value.
(a) Annual net earnings or surplus consisting of withheld annual net earnings may in the discretion of the directors be applied to legitimate corporate purposes such as payment of debts, reduction of deficits, capital improvements or extensions, and other ordinary business requirements, and to the extent that they are so used the inchoate right of non-cumulative preferred stockholders in such funds is lost or terminated. In this case, it was not within the normal operation of the business of the corporation to engage in the business of purchasing its own bonds at discounts. It would seem that the utilization of the earnings for such purpose, while an advantageous use of the corporate funds, is nevertheless not such a use as would deprive the preferred stockholders of their dividend rights in the funds so used. The capital surplus, as distinguished from the earned surplus, could be applied for the purchase of the company's bonds and the amount so used should be charged to that account, especially since I have concluded, as will hereafter be pointed out, that gains from such purchases are to be ratably shared among the stockholders as capital surplus.
(b) While the gains constituted income for tax purposes,Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 93L.Ed. ___ (1949), they do not in my opinion *Page 492 
constitute a source in which the non-cumulative preferred stock has a preferential interest. The profits so derived do not represent dividends previously withheld from annual net profits, from the operation of the business of the corporation. Indeed, the gains in the instant case were added directly to surplus. The reduction of a funded debt arising from the purchase and retirement of bonds at a discount is appropriately an addition to surplus. It is not an annual profit. In Agnew v. American IceCo., supra, the company from time to time purchased its outstanding bonds at a discount and recorded this discount as an addition to surplus rather than annual profit. The Court of Chancery included as a source for the payment of dividends on the preferred stock these annual net accretions to surplus. In this the Supreme Court found error, saying "The Vice-Chancellor found a total underpayment of $2 per share by reckoning as a part of earned surplus these annual net charges to the surplus account which were not a part of the annual net earnings. Disregarding these annual net charges to surplus as a preferred dividend source, there would be an overpayment of $1.40 per share." Therefore, the gains resulting from the acquisition of bonds at a discount do not constitute a source for the payment of preferential dividends to the preferred stockholders, but are additions to capital surplus in which all of the stockholders have an equal right in any distribution of assets, as provided in the charter.
 III.
All of the parties with the exception of the common stockholders agree that the annual net profits should be determined on a consolidated, rather than a non-consolidated basis. It has been stipulated that "the company conducted its business and the business of its wholly owned subsidiaries as though such subsidiaries were departments of the company. All of the receipts of the company and all of the receipts of its subsidiaries were deposited in the bank account of the company. The moneys deposited in these bank accounts from receipts of any subsidiary were credited to such subsidiary. *Page 493 
The operating expenses of each subsidiary were paid from the company's bank accounts and charged against such subsidiary. At times the amounts advanced for the account of the subsidiaries greatly exceeded the amounts received from such subsidiaries."
Since 1930 all subsidiaries of the Pacific Coast Company have been wholly owned, except the Pacific Coast Cement Corporation, of which it owns 93% of the stock. The company filed consolidated income tax returns and the taxes were paid directly by the parent company, no allocation of tax being made to the subsidiaries. Reports to stockholders have been on a consolidated basis. Thus, the affairs of the company and its subsidiaries are so interlocked and integrated that from every equitable and realistic standpoint profits and losses should be considered on a consolidated basis. The case of Cintas v. American Car andFoundry Co., supra, does not hold to the contrary; there, the facts justified a contrary treatment.
 IV.
The common stockholders contend that depreciation should be calculated on a basis of historical cost. The company has charged depreciation against earnings on a basis of the appraised valuation of the properties, upon which the reduction in capital was made in 1933, and has so reported annually to its stockholders. The practice of the company in charging depreciation on the basis of revaluation is equitable and proper.
 V.
The common stockholders further assert that there has been an overpayment to the preferred stockholders and seek credit with respect to future dividends, on the authority of Agnew v.American Ice Co., supra. The court there held that such right of offset for overpayments applies in the absence of estoppel, but that under the facts of that case one *Page 494 
of the prime elements of estoppel was wanting — "Mere lapse of time is not enough; the delay must be unreasonable and prejudicial." In the instant case, an overpayment to the preferred stockholders has not been established by proof. However, I would regard that the common stockholders are estopped from asserting any claim of overpayment for any period prior to the recapitalization in 1933, and in arriving at the amounts due the respective classes of stockholders the parties and the accountants will be guided accordingly.
I wish to conclude this opinion with an expression of appreciation to counsel whose briefs were decidedly helpful in arriving at a solution of the difficult problems involved, but with the observation that the briefs might well have been confined to fifty pages and the reply briefs to twenty pages, as provided by Rule 1:3-7.
Judgment accordingly. *Page 495